```
                   UNITED STATES DISTRICT COURT
                   SOUTHERN DISTRICT OF TEXAS
                        McALLEN DIVISION



UNITED STATES OF AMERICA,       )    CASE NO:  7:13-CR-0070-12
                                )
              Plaintiff,         )          CRIMINAL
                                )
      vs.                       )        McAllen, Texas
                                )
JORGE GARZA,                    )      Tuesday, July 30, 2013
                                )      (3:27 p.m. to 4:46 p.m.)
                 Defendant.      )
```

                 TESTIMONY OF FERNANDO GUERRA, SR.
                    DURING JURY TRIAL - DAY 1

                 BEFORE THE HONORABLE RANDY CRANE,
                   UNITED STATES DISTRICT JUDGE


<u>APPEARANCES</u>:

For Plaintiff:              JAMES H. STURGIS, ESQ.
                            ANIBAL J. ALANIZ, ESQ.
                            Assistant United States Attorney
                            1701 W. Business Hwy. 83
                            Suite 600
                            McAllen, Texas 78501


For Defendant:              LILLY ANN GUTIERREZ, ESQ.
                            Attorney at Law
                            4901 S. Jackson Road
                            Edinburg, Texas 78539


Interpreter:                Elena Medrano

Court Recorder:             Richard Cortez

Transcribed by:             Exceptional Reporting Services, Inc.
                            P.O. Box 18668
                            Corpus Christi, TX 78480-8668
                            361 949-2988


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

<u>INDEX</u>

| <u>GOVERNMENT'S WITNESS</u> | <u>DIRECT</u> | <u>CROSS</u> | <u>REDIRECT</u> | <u>RECROSS</u> |
|---|---|---|---|---|
| FERNANDO GUERRA, SR. | 4 | 18 | | |

1          **McAllen, Texas; Tuesday, July 30, 2013; 3:27 p.m.**

2      **(Partial transcript; testimony of Fernando Guerra, Sr.)**

3          **(Interpreter utilized for Spanish translation)**

4      **(Jurors present)**

5          THE COURT:  Alright, the government can call its next

6  witness.

7          MR. STURGIS:  Yes.  At this time, your Honor, the

8  government will call Fernando Guerra, Sr.

9          THE COURT:  Do you have someone to go get him?

10          MR. STURGIS:  He's in custody, your Honor.

11          THE COURT:  Oh, that's right.

12      (Pause)

13          THE COURT:  Members of the jury, the next witness is

14  going to be testifying in Spanish.  For those of you that know

15  and understand Spanish, I will ask you to listen to his

16  response in Spanish.  There are nuances that are lost in the

17  translation, so I would ask you just to listen to the Spanish

18  version.  For those that don't, his testimony will be

19  translated into English.

20          Can you please step forward, Mr. Guerra?  Mr. Guerra,

21  if you could raise your right hand to be administered the oath.

22      **FERNANDO GUERRA, SR., GOVERNMENT'S WITNESS, SWORN**

23          THE COURT:  Alright, please be seated over here,

24  Mr. Guerra.

25  //

Guerra - Direct / By Mr. Sturgis                    4

1          **(Fernando Guerra, Sr. takes the witness stand)**

2              **THE COURT:**  Alright, Mr. Sturgis, you may begin.

3                          **DIRECT EXAMINATION**

4    **BY MR. STURGIS:**

5    Q    Please state your name, sir.

6    A    Fernando Guerra, sir, Senior.

7    Q    And how old are you, sir?

8    A    Forty-nine.

9    Q    And where are you from?

10   A    From Reynosa, Tamaulipas.

11   Q    And have you lived here in the United States?

12   A    For thirty years.

13   Q    And where did you live when you were here in the United

14   States?

15   A    In north Edinburg at 2812 Sunrise Street, 8408.  Yes.

16   Q    And do you have a business right near that location?

17   A    Yes, I used to have trucks for transportation.  I still

18   have them.

19   Q    So it's a trucking shop?

20   A    It's Astro Transport, yes.

21   Q    And how many trucks did you have?

22   A    Right now I have only six trucks.

23   Q    And there's a shop there?

24   A    Yes, in the shop.

25   Q    And how long have you had Astro Trucking?

1  A     Six years.

2  Q     And is Fernando Guerra, Jr. your son?

3  A     Yes.

4  Q     Did he work with you in the trucking business?

5  A     He has another company, independent from mine.

6  Q     And what is that?

7  A     Heavenly Express.

8  Q     And would the Heavenly Express trucks go to Astro?

9  A     We're together, but they are independent companies.

10 Q     At some point, sir, did you become involved in drug

11 trafficking?

12 A     Yes.

13 Q     And when did that start, roughly, what year?

14 A     In 2010.

15 Q     And how did that get started?

16 A     I met a person, an officer with Hidalgo County.

17 Q     And what did that person want?

18 A     J. P. Flores.

19 Q     You met Mr. Flores in 2010?

20 A     Exactly it may have been a little before that.

21 Q     Before you met Mr. Flores, were you involved with

22 narcotics trafficking with other people like Julio Davila?

23 A     Yes.

24 Q     When did you first start any drug trafficking, not with

25 just Mr. Flores, but any drug trafficking?

1   A    I started with Davila, he would prepare fake documents.

2   Q    And when was that?  What year, roughly?

3   A    I do not recall the exact date.

4   Q    But it was before you met Mr. Flores?

5   A    Yes, before I met him.

6   Q    And how did you and Mr. Davila and whoever else do the

7   drug trafficking before Mr. Flores was involved?

8   A    When we first started on this, I had Davila and Aida, and

9   Aida would prepare fake documents.

10  Q    How did you get the drugs at that time?

11  A    Through people that I knew.

12  Q    And why would they give you drugs?

13  A    The reason would be that the person that was coming with

14  my friend, they were already in agreement with everything when

15  we first started.

16  Q    What did they want you to do with the drugs?

17  A    Those drugs, well, supposedly to transport them, which I

18  never did.

19  Q    You were supposed to transport them for someone else?

20  A    Yes, sir.

21  Q    Out of the Valley?

22  A    Out of the Valley, yes, out of here.

23  Q    But you were never going to transport them?

24       **MS. GUTIERREZ:**  Objection, your Honor, leading.

25       **THE COURT:**  Sustained.

1    //

2    **BY MR. STURGIS:**

3    Q    Were you going to actually transport them?

4    A    No.

5    Q    What was your intention?

6    A    To keep them.

7    Q    And do what with them?

8    A    Okay, to sell them, distribute them here in the Valley.

9    Q    How did you convince people that you were actually going

10   to transport them so they would give it to you?

11   A    That's when we first got started with Aida and Davila.

12   Aida would prepare fake documents.

13   Q    When were the fake documents prepared, before they gave

14   you the narcotics or after?

15   A    Okay, when the drugs had already been delivered to me, I

16   would give these people some information about the type of drug

17   and the load.  And once that truck had left, there would be an

18   incident, and so I would in turn give information about that to

19   the people.  Aida would prepare the fake documents.

20   Q    By the word 'incident', what do you mean?

21   A    I don't understand.

22   Q    When you said something happened after they gave you the

23   drugs, what did you mean by that?

24   A    Okay, I would tell the person there had been an incident

25   on the road, that some officials had stopped the load, and that

Guerra - Direct / By Mr. Sturgis                    8

1    information that that person had about the load, I would give

2    them a police report matching it.

3    Q    And would the police report indicate that the drugs had

4    been seized?

5    A    Yes.

6    Q    And why did you give these people this fake document?

7    A    Because the information that these people had been given

8    in a paper would have to match exactly with the police report.

9    Everything would coincide, indicate that it had been seized by

10   the police.

11   Q    And how did that help you?

12   A    In every way, because there was never -- we always got to

13   keep the material.

14   Q    And when you say 'material', what do you mean?

15   A    About drugs, we would give Davila and Aida their share,

16   and we had an agreement as for what it was.

17   Q    And what kind of drugs are you talking about?

18   A    Marijuana and cocaine.

19   Q    This was before you met Mr. Flores?

20   A    Yes, sir.

21   Q    How did you meet Mr. Flores?

22   A    Flores was introduced to me by Davila on one occasion.

23   Q    And after you met him, did you continue to see him and

24   talk to him?

25   A    Yes.  On one occasion I just forwarded some money to

1    Mr. Flores, and I already had a radio number for him, and

2    Davila did not give this money to Flores, so I communicated

3    with him directly.

4    Q    And when you say 'communicated with him', do you mean

5    communicated with Mr. Flores directly?

6    A    Because I had his radio.  Because he had given it to me

7    for some occasion, so at that time when I sent him the money,

8    he was not in agreement with what I had sent, so he came and

9    talked to me.

10   Q    And after that time, did you give him more money?

11   A    Yes, I gave him more money, and then he and I started

12   working together.

13   Q    And by 'working together', what do you mean?

14   A    In stopping cars using the vehicle of one of his working

15   partners.

16   Q    When you say 'stopping vehicles', do you mean the -- what

17   do you mean by 'stopping the vehicles'?  What was the first

18   stops that occurred?

19   A    Okay, it was to stop the person and then sometimes the

20   other person would not be in agreement, so we would try and get

21   all this information and we were using an officer friend of

22   his.

23   Q    When you say 'stopped for information', what type of

24   information are you trying to get?

25   A    To get their driver's license and all the information

Guerra - Direct / By Mr. Sturgis                    10

1    about that person.

2    Q    And why did you want that information?

3    A    To check who exactly those people were and so to prevent

4    them from being around my place.

5    Q    And were these some of the people that you were getting

6    drugs from?

7    A    Yes, sir.

8    Q    And who did you call to have these traffic stops made?

9    Who did you call?

10   A    J.P. Flores.

11   Q    J.P. Flores, okay.  And did some of these stops occur?

12   A    Yes.

13   Q    Did you see them?

14   A    Yes, sir.

15   Q    How were you able to see them?

16   A    Because this was because he was using this guy that would

17   make the traffic stops with a patrol car, but I had

18   communication with Mr. Flores, and so I would tell him what

19   time they were going to go there and at what time they were

20   going to leave.

21   Q    And when they left, did you actually see the traffic stop,

22   you, yourself?

23   A    Yes, sir.

24   Q    And did you see who was making this traffic stop?

25   A    Yes, sir.

1   Q    Did you know that person at that time?

2   A    Yes, sir.

3   Q    Where had you first met that person?

4   A    I had seen him around, but back then I would not speak to

5   him, but I met him at Love's on one occasion, and I greeted

6   him.  But I knew about him from way back.

7   Q    Okay.  You actually met him and talked to him at Love's

8   Truck Stop one time?

9   A    Yes, sir.

10  Q    When you met that person at that time, had you already

11  seen some of the traffic stops, or was that before any traffic

12  stops?

13  A    No, I had already seen him long before that.

14  Q    And before you met him, did you know a name of a person?

15  A    Yes, sir.

16  Q    What name did you know that person by?

17  A    'The Friend'.

18  Q    And who did you call him 'the friend' to?

19  A    I would use the amigo with J.P.

20  Q    That was the name you used to refer to this person?

21  A    Yes, sir.

22  Q    When you met this person at the Love's Truck Stop, did you

23  get his real name?

24  A    Yes, I already knew his name, what was his name, but I had

25  never spoken with him in person.

Guerra - Direct / By Mr. Sturgis                                12

1   Q    How did you know his real name before you met him in

2   person?

3   A    Because Mr. Flores would speak to him, and I was with

4   Mr. Flores when they were talking over the phone.

5   Q    And what name would you hear Mr. Flores refer to this

6   person that you could overhear?

7   A    Amigo.

8   Q    But did you at that time know his real name?

9   A    Yes, sir.

10  Q    How did you know his real name?

11  A    Jorge Garza.

12  Q    How did you know that was his real name?

13  A    Because I knew it was him.

14  Q    When you met him at the Love's Truck Stop, you knew that

15  person to be Jorge Garza already?

16  A    Yes, sir.

17  Q    And do you see that person in this courtroom?

18  A    Yes, sir.

19  Q    And where is this person sitting, and what is he wearing?

20  A    To my left-hand.

21  Q    And what is he wearing, sir?  Can you point to him?

22  A    He has a black suit with a gray shirt and a tie.

23  Q    And can you point to him, sir?

24  A    Yes.

25          **MR. STURGIS:**  Your Honor, please let the record

Guerra - Direct / By Mr. Sturgis                    13

1    reflect that the witness has identified the defendant.

2             THE COURT:  The record will so reflect.

3    BY MR. STURGIS:

4    Q    After you met him at the Love's Truck Stop, did you

5    witness him make any more traffic stops?

6             MS. GUTIERREZ:  Objection, your Honor, misstates the

7    evidence.

8             THE COURT:  I'm sorry.  This was after you met him at

9    the Love's Truck Stop, did you witness --

10            MR. STURGIS:  Any more.

11            THE COURT:  -- any more traffic stops?  Alright.

12            MS. GUTIERREZ:  But I believe the testimony was that

13   he met him at Love's before the traffic stops.

14            THE COURT:  He can answer the question.  He will

15   clarify it.

16   BY MR. STURGIS:

17   Q    Mr. Guerra, before you met Mr. Garza at the Love's Truck

18   Stop, had you seen him commit traffic stops?

19   A    Yes, sir.

20   Q    And then you met him at the Love's Truck Stop?

21   A    Yes, sir.

22   Q    After you met him at the Love's Truck Stop, did you

23   witness any more traffic stops for identification purposes, for

24   licenses?

25   A    Yes, sir.

Guerra - Direct / By Mr. Sturgis                                    14

1  Q    During that time, were you doing any narcotics deals with

2  Mr. Flores?

3  A    Yes, sir.

4  Q    And who were you using at that time to do narcotics deals

5  with Mr. Flores?

6  A    We would use, when we were making stops on Monte Cristo

7  Road, we would be also doing those stops with Mr. Garza.

8  Q    At first there were traffic stops for the information,

9  correct?

10 A    Yes, sir.

11 Q    That was before any traffic stops involving drugs?

12 A    Yes, sir.

13 Q    Before you did any traffic stops involving drugs, were you

14 working with Mr. Flores in the narcotics business in any way?

15 A    No, really at that time when we first got started, we were

16 working in checking the vehicles, and we started working

17 together from then on.

18 Q    So how did it go from stopping vehicles for information to

19 doing fake traffic stops for drugs?

20 A    Well, okay, what happened was that I started having

21 problems because those people were circling around, and so I

22 met in person with Mr. Flores and told him what was happening,

23 and he told me that he had a better idea about how to go about

24 things, and that's when we started to use the fake scenarios.

25 Q    When you and Mr. Flores agreed to try these fake

1   scenarios, who proposed the first idea on how to do it?

2   A     Mr. Flores.

3   Q     And what did he propose?

4   A     Mr. Flores proposed that we could use Amigo and make a

5   fake stop just turning the lights on in his patrol vehicle,

6   that it would look a lot better.

7   Q     At some point was there any discussion about having the

8   person in the vehicle run?

9   A     I did not understand that.

10  Q     Did you and Mr. Flores ever discuss having the person

11  driving the vehicle run away during the traffic stop?

12  A     On one occasion we discussed that, and we tried it once,

13  but that was it.  Later on, we came upon having the owners of

14  the material witness the fake stop being made by Mr. Garza.

15  Q     And where did these stops take place?

16  A     The stops would be on 88, and before you get to that road,

17  there is another street called Cuna Gonya (phonetic) or Jesus

18  Flores, and that's where the stops would take place.

19  Q     And how did the stops work?

20  A     Okay, the stops happened that the vehicle would be going

21  by a spot and Mr. Garza would always be waiting at the Grano de

22  Oro.  And so as the vehicle was coming out, Mr. Garza would be

23  there and the partner we called Amigo, and tell him where the

24  vehicle was and the type of vehicle.

25  Q     And when you say 'companero', who do you refer to as that?

1    A    Companero is J.P., and Amigo is Mr. Garza.

2    Q    So Mr. Flores would contact Mr. Garza?

3    A    Yes, sir.

4    Q    And where would you be?

5    A    I was riding with Mr. Flores in the truck.

6    Q    And was your son involved?

7    A    He's the one that would hire me.

8    Q    And where would he be?

9    A    Well, my son would be riding with the owner of the

10   material.  We would be -- my son would be riding with the owner

11   of the material behind the load, and we would be in the middle,

12   and then Mr. Garza would be waiting and the companero would

13   contact Amigo and tell him the type of vehicle.

14   Q    Okay.  And would you witness the traffic stop?

15   A    Yes, sir.

16   Q    And where did the traffic stop usually occur?

17   A    Okay, most of the time it would be on Jesus Flores or

18   Filegonia, but there's also this road next to 493 where there's

19   this bar called La Esquina, and Mr. Garza would be waiting

20   there and the stop would be done.

21   Q    During these times, do you know whether or not there was

22   any marijuana in the car that was being driven which was being

23   stopped?

24   A    There was nothing in it.  It was a fake scenario.

25   Q    And do you know where the marijuana was if it wasn't in

1   the car?

2   A    Well, what happened is that the material was supposed to

3   be in the vehicle.  That's what the owner thought, that the

4   material was in the vehicle, but it had really been left behind

5   somewhere else.

6   Q    And what would happen to the marijuana later?

7   A    Well, we would sell it and then I would pay Mr. Flores.  I

8   would keep a percentage.  And out of my half, I would give half

9   to Mr. Flores and he would be in charge of paying Mr. Garza.

10  Q    Do you remember whether or not there was ever a time in

11  which a trailer was used?

12  A    You mean a pickup with a trailer?

13  Q    Yes, sir.

14  A    Yes.

15  Q    And why was a trailer used on that one?

16  A    Well, because we used a trailer on that occasion because

17  the load would not have fit in a normal vehicle, so we used a

18  trailer and we put a pallet of grass in it to make it look

19  normal.  That's why we had to use that small trailer for the

20  transportation.

21  Q    And Mr. Guerra, how many times would you say that you ran

22  this scenario?

23  A    It was more than ten times.

24  Q    During these ten times, what would you say the average

25  amount of marijuana was that was being stolen and resold?

1   A    Well, it was -- that occasion when he used the trailer, it

2   was just over 600 pounds, because that was on the heavy side,

3   that's why we used the trailer.

4   Q    But what was the average load, the normal load?

5   A    I would not be able to tell you the exact quantity.

6   Sometimes it would be 300 pounds, sometimes 400.  It would vary

7   quite a bit.

8            **MR. STURGIS:**  I pass the witness, your Honor.

9            **THE COURT:**  Alright.  Cross examination?

10           **MS. GUTIERREZ:**  Thank you, your Honor.

11                       **CROSS EXAMINATION**

12  **BY MS. GUTIERREZ:**

13  Q    Mr. Guerra, how long did you engage in drug trafficking

14  with Julio Davila and Aida Palacios?

15  A    I would not be able to give you an exact date, but it was

16  quite over a long period of time.

17  Q    Can you estimate?

18  A    I think it was in 2010.

19  Q    Well, how long did you do it?  For a year?  Two years?

20  Two months?

21  A    It was on several occasions.

22  Q    And you used the services of the Julio Davila conspiracy

23  not only for fake documentation, isn't that correct?

24  A    Yes, exactly.

25  Q    And you used the Julio Davila conspiracy also to steal

Guerra - Cross / By Ms. Gutierrez                        19

1   money from -- to conduct traffic stops and steal money,

2   correct?

3   A     There was no theft of money.

4   Q     Isn't it true that there was an incident when there was a

5   woman who was traveling with about $40,000 of U.S. currency

6   that you had Julio Davila stop over by the Pharr, Texas, area?

7   A     Could you repeat the question, please?

8   Q     Isn't it true that there was an occasion where there was a

9   woman driving a white vehicle over in the Pharr, Texas, area

10  who had $40,000 and you asked Julio Davila to stop and steal

11  the money?

12  A     It was $130,000.

13  Q     Is this the incident that occurred in Pharr, Texas?

14  A     Yes.

15  Q     Is this the same incident where Julio Davila actually

16  stole the money and told you that he had found nothing?

17  A     Yes.

18  Q     And you later discovered that he in fact had stolen the

19  money, correct?

20  A     We never got to be certain, but we thought that had

21  happened, 99 percent.

22  Q     So you're telling me that on that occasion it wasn't

23  $40,000 that was supposed to be in the vehicle but $130,000?

24  A     One hundred thirty thousand.

25  Q     Is that the same occasion where there was an officer from

Guerra - Cross / By Ms. Gutierrez                    20

1    the Pharr police department who Julio Davila used?

2    A     It was an officer from Pharr, yes.

3    Q     So the Julio Davila conspiracy had access to police

4    officers in the Pharr, Texas, area, is that correct?

5    A     No, no, not from Pharr.  He had one friend but it was

6    Aida's friends on that occasion.

7    Q     And who were Aida's friends?

8    A     Charlie Vela and Aida stopped that vehicle.

9    Q     And you were present at that location, isn't that correct?

10   A     Yes, I was circling around.

11   Q     Where does Charlie Vela work?

12   A     Charlie Vela weeks with Rene Guerra.

13   Q     Okay.  So he also works for the Hidalgo County District

14   Attorney's office?

15   A     Yes.

16   Q     As what?  Do you know?

17   A     He was Aida's supervisor.

18   Q     Okay, so then you're telling me that Aida's supervisor and

19   Aida both were used by Julio Davila to stop and steal that

20   money?

21   A     Yes, it was a Cadillac.

22   Q     And isn't it true that the woman that had that money in

23   the car was actually going to take money to you to purchase

24   some drugs?

25   A     No, not to me.  Not to me.

EXCEPTIONAL REPORTING SERVICES, INC

Guerra - Cross / By Ms. Gutierrez                    21

1   Q    How is it that you got that information?

2   A    No, that information was forwarded to me by a person I

3   know.  He knew where that money was coming from and everything.

4   Q    And what's the name of that person?

5   A    It's a friend of mine whose friendship I lost after that

6   occasion because that money was not in the truck.

7   Q    And was that friend of yours supposed to get a cut of that

8   money?

9   A    From that money, me and my friend were going to get half

10  of it, and the other half would go to Aida and his friends and

11  to Davila.

12  Q    Okay.  So then what was your friend's name?

13  A    It's a person whose name is Carlos, but I never got to

14  talk to him again.

15  Q    I understand that, but what's Carlos' last name?

16  A    We never learned that.  Nobody tells you their last name.

17  Q    So he gave you his first name but not his last name?

18  A    Yes.

19  Q    Where is he from?

20  A    He's from Reynosa.

21  Q    So you're saying that out of the $130,000, you were going

22  to split that evenly, 65 each -- you and your friend Carlos

23  were going to keep $65,000, is that correct?

24  A    Yes.

25  Q    And Aida, Julio Davila and Trey Vela were going to keep

Guerra - Cross / By Ms. Gutierrez                    22

1    the other $65,000?

2    A    Yes.

3    Q    So then you did in fact use Julio Davila to make traffic

4    stops in order to steal money, correct?

5    A    That's just one occasion.

6    Q    But that did happen, correct?

7    A    Yes.

8    Q    And you also utilized Julio Davila and Aida Palacios in

9    order to conduct traffic stops in order to scare people away

10   from you or your son or your property, correct?

11   A    Yes.

12   Q    Isn't it true that you also used Julio Davila and Aida

13   Palacios in order to transport and store cocaine for you?

14   A    Yes.

15   Q    Isn't it true that you also used Julio Davila's brother,

16   Armando Davila, in order to -- I'm sorry, maybe it's Armando

17   Davila, but his brother, in order to pick up cocaine and

18   deliver it to you?

19   A    That job was done on one occasion by the brother, but I

20   would never deal with him directly.

21   Q    Right, but it was at your direction through Julio Davila,

22   correct?

23   A    I'm not exactly sure if that job was his or mine.  I

24   really do not remember exactly.

25   Q    So at some point it was more like you and Julio Davila

Guerra - Cross / By Ms. Gutierrez                    23

1    were partners, correct?

2    A    We were not partners, we were never partners.

3    Q    But you would split the proceeds of whatever was stolen?

4    A    Yes, yes.

5    Q    So you weren't partners, but you took equal shares in the

6    spoils?

7    A    Well, yes, you are right.

8    Q    Anything else you can remember that you used Julio

9    Davila's conspiracy for?

10   A    Not that I know.

11   Q    Julio Davila's conspiracy was used on one occasion to go

12   to a house to look for some cocaine, I think a mobile home, to

13   look for some cocaine that had been stolen and stored there,

14   isn't that correct?

15   A    In Pharr?

16   Q    Yes.

17   A    Yes.

18   Q    How much drugs was retrieved from that location?

19   A    None; they were robbed.

20   Q    And where did that information come from?

21   A    From some persons, people you meet on the street.

22   Q    People you meet on the street that just give you

23   information where drugs are stored?

24   A    Well, it's people you get to know over time, and then that

25   person knows another person, and then it all becomes a team.

Guerra - Cross / By Ms. Gutierrez                    24

1    Q    Okay.  So these were associates of yours?

2    A    Well, people with whom you would do the occasional job,

3    and that would be it; everyone would go their own way.

4    Q    Would everyone go their own way because you steal from

5    each other?

6    A    Really, well maybe you are right.

7    Q    So isn't it true that in this business it's very hard to

8    trust somebody?

9    A    You just need to get some people that you trust; that's

10   it.

11   Q    And in your case, you were the person who couldn't be

12   trusted, isn't that correct?

13   A    No, I was not that person that you just said, because I

14   didn't know the person.  It was the friend of a person I knew.

15   Q    Well I guess I'm talking in general about your schemes.

16   Isn't it true that you would contract to transport drugs but

17   then steal them from those persons who contracted with you?

18   A    I was never hired directly.  Friends of those people were

19   utilized to come to me.

20   Q    Well, wasn't it your son that was contracting?

21   A    My son on certain occasions because I had friends that had

22   come to me.

23   Q    Okay.  And on some occasions you would send out the Panama

24   Unit to raid a property to steal drugs, isn't that correct?

25   A    No.

Guerra - Cross / By Ms. Gutierrez                    25

1   Q    Are you saying you never sent out the Panama Unit in order

2   to steal drugs for you?

3   A    Okay, but Panama would do -- they would -- I would buy

4   from them, they would bring me the stuff of what they had done,

5   to me.

6   Q    But isn't it true that sometimes you would lead them to

7   the location to where the drugs were at?

8   A    Yes, on certain occasions, yes, I did that.

9   Q    Okay.  So don't you think that qualifies you as

10  untrustworthy?

11            **THE COURT:**  This is argumentative.

12            **MR. STURGIS:**  Judge, I don't understand.

13            **THE COURT:**  Right, next question.  This is argument.

14  **BY MS. GUTIERREZ:**

15  Q    Let's talk about your relationship with Julio Davila.  I

16  understand that in 2010 you were doing drug trafficking

17  activities with him.  How long had you known him?

18  A    Sometimes he would get people out of jail.

19  Q    My question is: How long had you known him?

20  A    Well, I knew him for some time, but I would not be able to

21  give you an exact date, but I can tell you that he would hire

22  Mr. Garza to watch his house when there was a job going on,

23  because he knew.  Well, it was Aida's house where I got leaved.

24  He would watch it.  At the time I didn't speak to him.  I

25  didn't really know him back then, but I knew he was a friend of

Guerra - Cross / By Ms. Gutierrez                    26

1    Davila.  And when Aida and him would leave, he would watch

2    their house.

3    Q    This is not something that you have personal knowledge of,

4    isn't that correct?

5    A    About what?

6    Q    That Davila would have Garza watch Davila's house.

7    A    Yes.

8    Q    Were you watching the house with them?

9    A    No, Mr. Garza would go and make rounds on Monte Cristo

10   Road where Davila lived.  I don't know the exact occasion, but

11   I know it's a bowling, it's cold.

12   Q    And my question is that you never saw this happen,

13   correct?

14   A    Could you repeat the question?

15   Q    You never saw Mr. Garza do rounds on Monte Cristo like you

16   stated?

17   A    I would not see him.

18   Q    Okay, so back to my original question, which is: How long

19   did you know Julio Davila?  You don't have to give me an exact

20   date.  I just need an estimate.

21   A    I couldn't give you exactly a date.

22   Q    And I'm not asking for a date.  Did you know him two years

23   prior to 2010?  Did you know him for five years?

24   A    No, I believe it was before that even.  I don't know

25   exactly.  I don't want to lie.

1   Q    So would you say that you knew Julio Davila for about ten

2   years before 2010?

3   A    No, no, I feel that it was around 2009.  I had known him a

4   short time before we started working together.

5   Q    And how did you meet him?

6   A    He would get people out of jail.

7   Q    Was he a bondsman?

8   A    Yes.

9   Q    And so would he get some of your people out of jail?

10  A    No, I never had my people in jail.

11  Q    Well you said that you meet him because he took people out

12  of jail, so what's the connection there?

13  A    He was introduced to me because he was in the business of

14  getting people out of jail.

15  Q    And you were in the business of possibly having some of

16  your people go to jail, is that right?

17  A    Well, always you need to know someone like that in case

18  there's an incident.  It's good to know a bondsman.

19  Q    And when you mention an incident, you're talking about

20  your drug dealing -- within the drug trafficking that you did?

21  A    No, for anything.

22  Q    And so how is it that you and Julio Davila began to engage

23  in drug trafficking activities?

24  A    Well, we started talking over time, we kept talking and we

25  started on that.

Guerra - Cross / By Ms. Gutierrez                28

1   Q    Were you already involved in drug trafficking when you met

2   Julio Davila?

3   A    No.

4   Q    Did Julio Davila introduce you to drug trafficking?

5   A    We started talking.

6   Q    Okay.  Well, talked about what?

7   A    Because he would bail people out of jail, and that's how

8   we started the relationship.

9   Q    Are you saying that at the time that you met Julio Davila,

10  you were in a legitimate job?

11  A    Of course, I had my trucks.  I had my trucks, I had them,

12  I still do, and I also had a backhoe company.

13  Q    Let me ask you about your company, your trucking company.

14  You've already pled guilty to conspiracy, is that correct?

15  A    Yes.

16  Q    Yet you're still operating your trucking company?

17  A    My company has nothing to do with this.  It was never

18  used.

19  Q    So the government isn't taking your trucking company from

20  you, is that correct?

21  A    My trucks were never used for illegal stuff.

22  Q    Well, yeah, but you made a lot of money during your drug

23  trafficking activities, correct?

24  A    But that money I never invested in my trucks or my

25  equipment.  I had my job.

Guerra - Cross / By Ms. Gutierrez                    29

1   Q    What did you invest your drug trafficking money in?

2   A    I purchased some properties that were seized.

3   Q    And you also stored some money away, is that correct?

4   A    I couldn't answer that question because I do not have

5   money.

6   Q    Well, you either have money or you don't.

7   A    I do not have.

8   Q    But you have enough money to hire two lawyers to represent

9   you in this case, correct?

10         **THE COURT:** Can you approach?

11         **(Bench conference begins at 4:24:22 p.m.)**

12         **THE COURT:** I don't think that's ever a proper

13   question, whether the lawyers are retained or they've been

14   appointed.  How does paying for his lawyers --

15         **MS. GUTIERREZ:** Well then I'll move on.

16         **THE COURT:** -- is never permitted.

17         **MS. GUTIERREZ:** Well I'm not asking how they did

18   that.  I'm just making a statement of the fact that out of all

19   these --

20         **THE COURT:** There's an order of forfeiture on all

21   these properties that he brought.

22         **MR. STURGIS:** His trucking company is being forfeited

23   by the way.

24         **MS. GUTIERREZ:** Oh, it is?

25         **THE COURT:** Oh, it is.  He doesn't even know that.

1            **MS. GUTIERREZ:**  Okay, I'll move on.

2            **THE COURT:**  Well, you can in his territory, but that

3    one is not a question you can ask.

4            **MR. STURGIS:**  Just for the record, he did answer

5    truthfully, the trucks, we didn't think that the trucks had

6    much value, they're old, but the property and everything was

7    taken.

8            **MS. GUTIERREZ:**  The business itself?

9            **MR. STURGIS:**  Yes.

10           **THE COURT:**  Those little trucks you can --

11           **MS. GUTIERREZ:**  Can I tell him to look at me?

12           **THE COURT:**  Yeah.

13        **(Bench conference concludes at 4:25:17 p.m.)**

14           **THE COURT:**  Mr. Guerra, can you sit up to the

15   microphone so we can better understand your answers, better

16   hear you?  Thank you.

17           **THE WITNESS:**  Thank you.

18           **THE COURT:**  Alright, you may continue.

19   **BY MS. GUTIERREZ:**

20   Q    Okay, so how long had you known Mr. Davila before you met

21   J.P. Flores?

22   A    He introduced him to me.

23           **THE COURT:**  No, the question was how long had you

24   known him before.

25           **THE WITNESS:**  Let me repeat the same question.  I met

1  him in 2009 in the middle, like around the sixth month of 2009.

2  **BY MS. GUTIERREZ:**

3  Q    And are you talking about you having met Davila or J.P.

4  Flores at that time?

5  A    No, that's when I met Mr. Davila.

6  Q    So when did you meet J.P. Flores?

7  A    Later on he introduced him to me as his compadre.

8  Q    And how much later on after you met Davila did you meet

9  J.P. Flores?

10  A    I could not give you an exact date.

11  Q    Give me an estimate.  A year later?  Three months later?

12  Five years later?

13  A    I believe it was before 2010 that I met him.

14  Q    Mr. Guerra, when you -- before you met J.P. Flores, were

15  you donating money and making financial contributions to the

16  Hidalgo County Sheriff's office?

17         **THE COURT:**  You don't mean the sheriff's office, do

18  you?

19         **MS. GUTIERREZ:**  Well, the sheriff's department.  I'm

20  not sure, the different activities that were conducted within

21  the county.

22         **THE COURT:**  Alright, ask your question if that's the

23  question you want.

24         **THE WITNESS:**  Would you repeat it, please?

25  **BY MS. GUTIERREZ:**

1  Q    Before you met J.P. Flores, were you contributing or

2  making financial contributions to any fund raiser or campaign

3  within the Hidalgo County Sheriff's Office?

4  A    I started out with Flores, but on one occasion I also gave

5  Davila money for the campaign.

6  Q    Is that -- Are you talking about Sheriff Guadalupe Lupe

7  Trevino's campaign?

8  A    Yes.

9  Q    And how much did you give Davila?

10  A    I do not recall.  I do not remember exactly.

11  Q    Was it a hundred thousand dollars?

12  A    No, not at all.

13  Q    Okay.  Can you give me an estimate as to how much it was?

14  A    Maybe a thousand dollars, two thousand dollars.

15  Q    How many times would you say that you gave money directly

16  to either Davila or J.P. Flores for the sheriff, Lupe Trevino?

17  A    Well, for the sheriff's campaign I gave money and checks.

18  Q    And this money and checks that you gave were for campaign

19  signs or for what purpose?

20  A    Yes.

21  Q    Isn't it true that you also donated money together with

22  your son for a boat for Sheriff Trevino?

23  A    Yes.

24  Q    How much money did you donate at that time?

25  A    I do not remember.

1          **THE COURT:**  What was your purpose?  Why were you

2    doing this?

3          **THE WITNESS:**  I could not quite define that answer,

4    but it would be simply to have people on your side.

5    **BY MS. GUTIERREZ:**

6    Q    Was it so that you could get papers from the county?

7    A    Well, really the man never gave any favors to me.

8    Q    Well, by 'the man', do you mean Sheriff Trevino himself?

9    A    Yes.

10   Q    But the people under him certainly did favors for you,

11   isn't that correct?

12   A    Well, I don't know who you're talking about when you say

13   'people under him'.

14   Q    Well, isn't it true that you gave money to Joe Padilla?

15   A    Yeah, the Commander, yes.

16   Q    And how much did you give Joe Padilla?

17   A    Well, it was on several occasions.

18   Q    Can you tell me how much?  Maybe give me an estimate as to

19   the total?

20   A    The total, it would always be two, three thousand dollars;

21   that was it.

22   Q    And isn't it true that the money that you gave Padilla was

23   to be given to Lupe Trevino?

24   A    It was for him.  I believe on those occasions it was not

25   for Mr. Trevino.

1   Q    And you gave money to Padilla and Sheriff Trevino for

2   protection, isn't that correct?

3   A    I never gave Mr. Trevino money for protection.

4   Q    You gave Mr. Joe Padilla money for protection, correct?

5   A    For information.

6   Q    And that information was for your protection, correct?

7   A    Well, yes, but independent from him.  It was information

8   that we wanted to know about.

9   Q    Who is 'we'?

10  A    Well, me and my friends, my acquaintances.

11  Q    Isn't it true that the Hidalgo County Sheriff's office at

12  some point raided your business and seized several firearms?

13  A    The sheriff's office has never seized weapons from me.

14  They went there as part of the fast and furious.  Federal

15  agents went there and they were giving support to those agents.

16  Q    Isn't it true that you solicited Julio Davila's assistance

17  in retrieving some firearms from the Hidalgo County Sheriff's

18  office that had been seized from your business?

19  A    I hired a lawyer to take that case.

20  Q    Okay.  And we're talking about the firearms, correct?

21  A    Yes, correct.

22  Q    So then it is true that firearms were seized from your

23  business, correct?

24  A    No, not from my business, from my home.

25  Q    And your home is next to your business, correct?

1   A    Yes, it's divided by a fence.

2   Q    And you were able to retrieve successfully those firearms,

3   correct?

4   A    Those weapons, there was an investigation, and it really

5   about one of the calibers.  They took six weapons and they were

6   checked and then my lawyer was able to retrieve them.

7   Q    What lawyer did you use at that time?

8   A    Eric Jarvis.

9   Q    Is that the lawyer that Julio Davila was working with?

10  A    Yes.

11  Q    And so it was Julio Davila that connected you with Eric

12  Jarvis, correct?

13  A    No, I called Eric.

14  Q    You were able to have Deputy J.P. Flores run some license

15  plates for you, isn't that correct?

16  A    J.P. Flores, can you repeat the question?

17  Q    Yes.  You had Deputy J.P. Flores run some plates for you,

18  isn't that correct?

19  A    Yes.

20  Q    And you also had him check registration for you, correct?

21  A    Yes.

22  Q    And you paid J.P. Flores for that service, correct?

23  A    Yes.

24  Q    And at that time, you knew that you were misusing that

25  public position, correct?

Guerra - Cross / By Ms. Gutierrez                    36

1    A    Yes.

2    Q    And the reason that you were running these plates were

3    that you were checking up on individuals who you were planning

4    to steal drugs from?

5    A    Well, no, those people that were being investigated or

6    checked, that was being done by Mr. Garza.  Mr. Flores for

7    Mr. Garza.

8    Q    And I think we're talking about two things right now.  I

9    am talking about when you would pay J.P. Flores to run license

10   plates and registrations from his office.

11   A    Okay.

12   Q    And the purpose for those checks was because you were

13   having checks on vehicles of the owners of drugs that you were

14   planning to steal?

15   A    Maybe you're right in that for those vehicles we wanted to

16   know about the license numbers.  Any information -- the closest

17   information about those people.

18   Q    And what was the purpose of getting that information?  How

19   is that going to help you in stealing the drugs?

20   A    We wanted to know who exactly were those people, but

21   again, the stops were being made by Mr. Garza.

22   Q    Again, Mr. Guerra, I'm not talking about physical stops.

23   I am talking about checks that you would have J.P. Flores

24   conduct out of his office.

25   A    There were several checks, check ups, but you're referring

Guerra - Cross / By Ms. Gutierrez                    37

1    to him individually?

2    Q    Yes, J.P. Flores, individually.

3    A    Yes.

4    Q    How many checks did J.P. Flores do for you?

5    A    There were several occasions.

6    Q    Okay.  Well, would you say it was 30 times?

7    A    No.  Over ten times, yes, but not over 30 times.

8    Q    Isn't it true you told investigators that he ran checks

9    for you approximately 20 to 30 different occasions?

10   A    The thing is I'm getting a little bit confused.  Can you

11   please repeat the question?

12   Q    I'm asking you isn't it true that J.P. Flores ran

13   registrations for you on approximately 20 to 30 different

14   occasions?

15   A    Well, it's just that I asked him for information just on a

16   few several occasions.  The stops we always would do with

17   Mr. Garza, but I understand that's what you're asking.

18   Q    And I believe that you're right, Mr. Guerra, that you said

19   that I'm asking you about independently of the stops.  I'm

20   asking you about, because the registrations were run by J.P.

21   Flores, isn't that correct?

22   A    Well, it's just that with J.P. it was not for too many

23   times when he did the investigations.  He would have the

24   conspiracy with Mr. Garza.  But maybe when I gave that figure,

25   20 to 30 occasions, that was the total.

EXCEPTIONAL REPORTING SERVICES, INC

Guerra - Cross / By Ms. Gutierrez                    38

1   Q    Okay.  Would you agree with me that running a registration

2   is different than making a traffic stop?

3   A    It's different but it applies to the same question because

4   we want to find out the information of the people.

5   Q    Okay.  Well, this will go much smoother if you just answer

6   my question, and then we'll get to where we're going much

7   faster.

8   A    Okay, ask the question, please.

9        **THE COURT:**  It seems like it may be in the

10  translation.  Running license plates, running driver's

11  licenses.

12       **MS. GUTIERREZ:**  Well, it was running registrations,

13  which I believe is very different than doing actual physical

14  traffic stops.

15       **THE COURT:**  But I don't know this, maybe there's some

16  confusion because at traffic stops registrations are run also.

17       **MS. GUTIERREZ:**  Correct.  However, well --

18       **THE COURT:**  Maybe you can clarify.  I'm just trying

19  to speculate as to some of the confusion here as there may be

20  some overlap.

21       **THE WITNESS:**  That's correct.

22  **BY MS. GUTIERREZ:**

23  Q    During the traffic stops that you are alleging Mr. Garza

24  was involved in, were registrations run at that time?

25  A    We would check those people.  We would obtain information

Guerra - Cross / By Ms. Gutierrez                    39

1   about them, their license plates of all the information of the

2   people riding in the vehicle.

3   Q    Okay.  But you agree that you don't need to conduct a

4   traffic stop in order to get a license plate off a vehicle,

5   correct?

6   A    That's a very different question.  Whenever Mr. Garza

7   would stop a vehicle, we would gather the data for that person

8   and the license plates of the vehicle.

9   Q    Okay.  So on the traffic stops, the only thing that was

10  done was identify the occupants in the vehicle and get a

11  license plate.  Is that what you're telling me?

12  A    Yes, correct.

13  Q    And so you would agree that that's different than running

14  a registration?

15  A    Yes, it's totally different because once you get the

16  license plates, when you ask that question, you got me

17  confused.

18  Q    Okay.  So then once the traffic stop was done, there was

19  information that was gathered.  What would you do with that

20  information?

21  A    I week keep it.

22  Q    How would you use it?

23  A    Just for nothing.  I just wanted to know exactly what the

24  name of those people was.

25  Q    Okay.  And this goes back to my original question, which

Guerra - Cross / By Ms. Gutierrez                    40

1    is how would that help you in stealing the drugs from those

2    individuals?

3    A    Well, because many people do not give you their correct

4    name, so that's when we would use Mr. Garza to stop the cars

5    and we would get the real information of that person and where

6    that person lives.

7    Q    Would you go to their home?

8    A    No, I just wanted to know where they were.

9    Q    So are these individuals that you would contract with with

10   respect to drug transportation, and then you wanted to know

11   their real names?

12   A    Yes.

13            **THE COURT:**  Alright, why don't we recess here for the

14   day.

15            Members of the jury, tomorrow we'll begin at 9:00

16   A.M., just like we did today.  Please remember not to discuss

17   the case with anyone.  Please don't read anything in the

18   newspaper or watch anything on TV or listen to anything on the

19   radio about this case.  All the evidence that you will need to

20   decide this case will be presented to you here in the

21   courtroom.

22            You'll be given some envelopes.  If you could put

23   your notes in the envelopes and they'll be kept in a vault

24   overnight and be returned to you tomorrow morning.  Please keep

25   your juror badges any time you're in this building to make sure

EXCEPTIONAL REPORTING SERVICES, INC

1   everybody understands that you're a juror.

2           Thank you for being here.  The jury is excused.

3       **(The jury exits the courtroom at 4:46 p.m.)**

4       **(Requested transcription concluded at 4:46 p.m.;**

5   **proceeding continued)**

CERTIFICATION


I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.




_____          _May 13, 2014_


                    TONI HUDSON, TRANSCRIBER