UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
McALLEN DIVISION


| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO:  7:13-CR-0070-12 |
| | ) | |
| Plaintiff, | ) | CRIMINAL |
| | ) | McAllen, Texas |
| vs. | ) | Wednesday, July 31, 2013 |
| | ) | ( 9:15 a.m. to 10:10 a.m.) |
| JORGE GARZA, | ) | (10:34 a.m. to 11:16 a.m.) |
| | ) | (11:34 a.m. to 12:01 p.m.) |
| Defendant. | ) | ( 1:39 p.m. to  2:56 p.m.) |
| | ) | ( 3:31 p.m. to  4:20 p.m.) |

TESTIMONY OF FERNANDO GUERRA, SR.
DURING JURY TRIAL - DAY 2

BEFORE THE HONORABLE RANDY CRANE,
UNITED STATES DISTRICT JUDGE

<u>APPEARANCES:</u>

For Plaintiff:            JAMES H. STURGIS, ESQ.
                         ANIBAL J. ALANIZ, ESQ.
                         Assistant United States Attorney
                         1701 W. Business Hwy. 83
                         Suite 600
                         McAllen, Texas 78501


For Defendant:           LILLY ANN GUTIERREZ, ESQ.
                         Attorney at Law
                         4901 S. Jackson Road
                         Edinburg, Texas 78539


Interpreter:             Elena Medrano / Steven Mines

Court Recorder:          Richard Cortez

Transcribed by:          Exceptional Reporting Services, Inc.
                         P.O. Box 18668
                         Corpus Christi, TX 78480-8668
                         361 949-2988


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

2

## INDEX

| GOVERNMENT'S WITNESS | CROSS | REDIRECT | RECROSS |
|---|---|---|---|
| FERNANDO GUERRA, SR. | 3/30/50/63/101 | 109 | 112 |

| DEFENSE EXHIBITS | RECEIVED |
|---|---|
| 6, 7 | 105 |

3

1          **McAllen, Texas; Wednesday, July 31, 2013; 9:15 a.m.**

2          **(Partial transcript; testimony of Fernando Guerra, Sr.)**

3              **(Official interpreter utilized for translation)**

4          **(Jurors present)**

5                  **THE COURT:**  Okay.  A brief legal issue.  We're

6      prepared to start now.  Ms. Gutierrez, you may commence.

7                  **MS. GUTIERREZ:**  Thank you, your Honor.

8          **FERNANDO GUERRA, SR., GOVERNMENT'S WITNESS, PREVIOUSLY SWORN**

9                      **CROSS EXAMINATION (CONTINUED)**

10     BY MS. GUTIERREZ:

11     Q    Good morning, Mr. Guerra.

12     A    Good morning.

13     Q    Mr. Guerra, when were you arrested?

14     A    On February the 7th.

15     Q    And since then, have you spoken to J.P. Flores?

16     A    Yes.

17     Q    How many times?

18     A    Several occasions.

19     Q    And how is it that you communicate with Mr. Flores?

20     A    When I was in Laredo I spoke to him about three, four

21     times only.

22     Q    And you were the one who would initiate a phone call; is

23     that correct?

24     A    Yes.

25     Q    Did you ever speak with him in person?

4

1   A    No.

2   Q    And can you tell me around when that was that you were

3   arrested in February?

4   A    When I was under arrest?

5   Q    I understand that, but was that soon after you were

6   arrested or was that still in the month of February?

7   A    Yes, you mean before I was arrested?

8   Q    No, after you were arrested.

9   A    After I was arrested I was sent to Laredo and I spoke to

10  him over the phone about four times.

11  Q    Okay.  And was that soon after you were arrested or was

12  that three or four times between that time and now?

13  A    I no longer had the ability to communicate with him.  I

14  spoke with him about four times when I was in Laredo.  I was in

15  Laredo for a few months, then I was in La Villa for another

16  three months, but there has been no communication.

17  Q    And are you still in La Villa?

18  A    Right now I'm in Willacy.  I was just moved to Willacy.

19  Q    How long have you been in Willacy?

20  A    Three days.

21  Q    Okay.  So, then, it's fair to say that between February

22  7th, 2013 to about May 7th of 2013 you were in communication

23  with J.P. Flores about four times?

24  A    When I was in Laredo I spoke with him about four times,

25  more or less.  That's during the month of February.  In March I

5

 1    didn't talk to him and May I haven't.

 2    Q    So, in February you actually communicated with him by

 3    telephone where you on one end and J.P. Flores was on the other

 4    end.  Is that correct?

 5    A    Yes.

 6    Q    Okay.  And since February of this year have you

 7    communicated with J.P. Flores in any way that was not by

 8    telephone?

 9    A    No, in no other way.

10    Q    You haven't sent any messages to J.P. Flores?

11    A    I have no communication with anybody.

12    Q    Well, are you married?

13    A    Yes.

14    Q    You have communication with your wife, don't you?

15    A    Yes.

16    Q    And you have communication with your son, don't you?

17    A    With which son?

18    Q    Fernando Guerro, Jr.

19    A    No, I don't speak with him.

20    Q    But you have communication with other family members?  Is

21    that correct?

22    A    With my wife.

23    Q    Do you have any other children?

24    A    Yes, I have another son.

25    Q    What is his name?

6

1    A    Humberto.

2    Q    How old is he?

3    A    Twenty-two.

4    Q    And you have communication with him; isn't that correct?

5    A    Very rarely I do greet him, but mostly I speak with his

6    mother.

7    Q    And your wife has communication with Fernando Guerra, Jr.,

8    correct?

9    A    Yes.

10   Q    Is Fernando Guerra, Jr. married?

11   A    Yes.

12   Q    What is his wife's name?

13   A    Lizette.

14   Q    And you have communication with Lizette, don't you?

15   A    No, I do not have communication.

16   Q    Have you communicated with your son, Fernando Guerra, Jr.,

17   through your wife?

18   A    We cannot speak.

19   Q    My question is have you communicated with your son,

20   Fernando Guerra, Jr., through your wife?

21           MR. STURGIS:  Judge, I'm going to object as asked and

22   answered.

23           MS. GUTIERREZ:  Your Honor --

24           THE COURT:  He said earlier he hadn't.

25   //

**BY MS. GUTIERREZ:**

Q    What did you and J.P. Flores talk about?

A    Well, when I was in Laredo I spoke to him four or five times.  That was just greeting me and he would ask how I was doing and I would say, "Well, I'm under arrest," and things related to that.

Q    Isn't it true that you talked to J.P. Flores about this case?

A    About this case I do not recall exactly, but I did tell him how things were going.

Q    And you told him that the government was asking about him running registrations for you; isn't that correct?

A    Could you repeat the question, please?

Q    You asked Mr. Flores -- you informed Mr. Flores about the fact that the government was inquiring whether Flores had run registrations for you.

A    I told him.

Q    So, you talked about giving Flores this possible exposure in this case; isn't that correct?

A    Exposed in which way?

Q    Well, in the way that he was involved in the criminal activity.

A    Earlier on, he had already been asked about that.

Q    And who had asked him?

A    Some other officers after Fabian was arrested along with

8

1    the other Panama people.

2    Q    You said J.P. Flores informed you about the government

3    speaking to him; is that correct?

4    A    Yes.

5    Q    And so, J.P. Flores is the one, then, who informed you

6    about your possible exposure in this case.  Is that correct?

7    A    Yes.

8    Q    Do you recall about when that happened?

9    A    I do not recall the exact date.  That's when Panama was

10   arrested.

11   Q    Do you recall when the Panama Unit was arrested?

12   A    I do not recall exactly.

13   Q    Have you reviewed any documents or any reports or

14   statements in preparation for your testimony yesterday and

15   today?

16   A    No.

17   Q    Has anyone told you what to testify yesterday and today?

18   A    No.

19   Q    What is your status here in the United States, Mr. Guerra?

20   A    I've got a resident passport for the last 27 years.

21   Q    Does that mean that you're a legal permanent resident?

22   A    Yes.

23   Q    Can you tell me when you came to the United States?

24   A    It was exactly before those 27 years -- it was 30 years

25   ago.

```
1   Q    And where did you come from?

2   A    From Reynosa.

3   Q    Who did you come with?

4   A    By myself to work.

5   Q    Where did you come to work?

6             MR. STURGIS:  Judge, again (indiscernible) what the

7   relevance is --

8             THE COURT:  Why did you come to work?

9             MR. STURGIS:  -- why is he coming to work 30 years

10  ago.

11            MS. GUTIERREZ:  No, where?  Where did he come to

12  work?  Your Honor, he testified yesterday about the fact that

13  he was a legitimate business owner prior to this and so I need

14  to get to that.

15            THE COURT:  Thirty years ago, maybe we could be more

16  temporally relevant.

17            MS. GUTIERREZ:  Well I -- at least we want to know --

18            THE COURT:  How he developed Astro Trucking?

19            MS. GUTIERREZ:  Well, exactly, because --

20            THE COURT:  Well, ask him that, then.

21  BY MS. GUTIERREZ:

22  Q    Mr. Guerra, you haven't had Astro Trucking for 30 years,

23  have you?

24  A    No, I've had it for six to eight years -- eight years, I

25  believe.  I don't know exactly how long, but I also had a
```

1   backhoe business.

2   Q    And so, how many years did you have Astro Trucking

3   established before you started your criminal activity?

4   A    Four or five years.

5   Q    And is that why you say that you -- that that business had

6   no -- you didn't invest any of your drug trafficking money into

7   your business because it had already been established four or

8   five years?

9   A    Yes.

10  Q    Isn't it true, Mr. Guerra, that you registered Astro

11  Transport December 9th of 2008?

12  A    That's Astro Transport.  We already had Astro Trucking.

13  Q    Is Astro Trucking incorporated?

14  A    That was an independent company so when we transform it to

15  an LLC that's when it become Astro Transport.

16  Q    Okay.  So, let's talk about Astro Trucking.  Is that

17  incorporated?

18  A    That company when we made it into an LLC we removed the

19  trucking and it became Astro Transport, LLC.

20  Q    So, you're saying that Astro Trucking ceased to exist once

21  you -- well, once you made it an LLC into Astro Transport?

22  A    Yes, exactly.

23  Q    And so, is Astro Trucking incorporated?

24  A    Yes, it has always been.  We would run up to New York.

25  Q    Well, was Astro Trucking an LLC?

1   A    No, we incorporated it into an LLC.

2   Q    And whose name was Astro Trucking under?

3   A    Under my name.

4   Q    Did you fill out an assumed name certificate for that

5   company?

6   A    Yes, it was done.  Everything was done correctly.

7   Q    And so, for how long did you have Astro Trucking before

8   you incorporated it -- I'm sorry, before it became an LLC to

9   Astro Transport?

10   A    I believe two or three years before.

11   Q    So, would you say that you had Astro Trucking sometime

12   around 2006?

13   A    Well, I do not know the exact date, but I believe it was

14   two years prior and because things started to go well, business

15   was good, we expanded.  So, that's why we went for the LLC.

16   Q    And so, then, as of December of 2008 your business was

17   doing well, correct?

18   A    Yes.

19   Q    Okay.  And in December of 2008 when you registered Astro

20   Trucking and it became Astro Transport, were you trafficking

21   drugs at the time?

22   A    No.

23   Q    So, if your business was going well, what is it that led

24   you into drug trafficking?

25   A    Maybe it was about influence.  I'm responsible for it, but

12

1    I would not be able to answer that question.

2    Q    Well, how did you get started in your drug trafficking

3    activities?

4    A    When I met Mr. Davila.

5    Q    So, is it your testimony that Julio Davila is the

6    individual who introduced you to the life of drug trafficking?

7    A    In a manner, he did.  We are responsible for our own

8    actions, but that's how this got started.

9    Q    And what was your first drug deal?

10   A    I do not recall.

11   Q    Was that done together with Julio Davila?

12   A    Yes.

13   Q    Did he -- did Julio Davila ask for your services in order

14   to help him do some drug dealing?

15   A    I do not recall exactly, but we started back then.

16   Q    And you saw that it was lucrative and continued; is that

17   correct?

18   A    Maybe you're right.

19   Q    And so, even though your company was successful, you were

20   interested in making even more money.  Is that correct?

21   A    Yes.

22   Q    You testified that you met Davila in 2009.  Is that

23   correct?

24   A    More or less in the sixth month of 2009.

25   Q    So, how long did you know Julio Davila before you started

13

1    -- well, before you did your first drug deal?

2    A    I met him more or less around that time and then a little

3    bit of time went by and then we did our first deal.  But I do

4    not recall exactly when.

5    Q    Well, was it a month after you met him?  Was it a year

6    after you met him?

7    A    Maybe we started in 2010 or before 2010.  I do not

8    remember.

9    Q    Okay, well, you testified that you were engaging -- you

10   were already engaging in drug trafficking prior to meeting J.P.

11   Flores.  Isn't that correct?

12   A    Yes.

13   Q    Isn't it correct that you said -- you testified also that

14   you met J.P. Flores sometime prior to 2010?

15   A    Yes, he was introduced to me by Mr. Davila.

16   Q    And so that means that you were engaging in drug

17   trafficking at some point between June of 2009 to December of

18   2009, correct?

19   A    No, I met Mr. Davila and we started talking and I believe

20   that we did one deal at the beginning of 2010, but I believe

21   Mr. J.P. was not involved in it.

22   Q    Mr. Guerra, yesterday you testified that you were already

23   engaged in drug trafficking activities with Julio Davila prior

24   to meeting J.P. Flores.  Do you recall that?

25   A    Yes, yes.

14

1    Q    And you testified that you met J.P. Flores prior to 2010,

2    correct?

3    A    Yes.

4    Q    And so, you testified -- you also testified yesterday and

5    today that you met Julio Davila around June of 2009, correct?

6    A    Yes.

7    Q    So, that can only mean that you were already -- you were

8    engaging in drug trafficking activity between the month of June

9    of 2009 and December of 2009.

10   A    Maybe in December 2009, yes.

11   Q    Are you saying that your drug trafficking activities with

12   Julio Davila were done only in December of 2009?

13   A    Maybe I did one with him around that time.

14   Q    Okay.  You testified that you were employing Julio

15   Davila's fake documentation preparation in an effort to conceal

16   your thefts of drugs, correct?

17   A    Yes.

18   Q    And at some point those fake documents weren't working for

19   you any more and you were getting a lot of new problems from

20   the owners who weren't accepting those documents, correct?

21   A    Yes.

22   Q    And because of that, then you engaged in the other scheme

23   of conducting traffic stops and having the owners see the

24   traffic stops because it would be more convincing, correct?

25   A    Yes.

EXCEPTIONAL REPORTING SERVICES, INC

15

1  Q    So, right now you testified that maybe you did one deal

2  with Julio Davila prior to meeting J.P. Flores.  That isn't

3  correct, is it?

4  A    Yes.  Yes, it is correct.

5  Q    And so, then, you're saying that you used the fake

6  documentation only once before you started engaging in the fake

7  traffic stops?

8  A    One or two times and it did not work real well.

9  Q    But isn't it true that you had Julio Davila and Aida

10  Palacios pick up cocaine at your house and you stored it at

11  their house?

12  A    Would you please repeat the question?

13  Q    Isn't it true that you had Julio Davila and Aida Palacios

14  pick up cocaine at your house and store it at their house?

15  A    Yes.

16  Q    So, that indicates that you were engaging in drug

17  trafficking at that time, correct?

18  A    No, but it was not on that date; it was after 2010.

19  Q    Okay.  So, then, your testimony is that you were engaging

20  in criminal activity with both Julio Davila and his conspiracy

21  and J.P. Flores and his conspiracy?  Is that correct?

22  A    With J.P. I never talked to him until later on.  I got to

23  meet him; I greeted him; I started talking to him, but he was

24  the friend of them.

25  Q    Okay.  So, are you saying that your relationship with J.P.

1    Flores was just a friendship, with no mention of illegal

2    activity and no criminal conduct?

3    A    That's right.

4    Q    Isn't it true that through Julio Davila you learned that

5    J.P. Flores was running registrations for Julio Davila for

6    money?

7    A    Yes.

8    Q    And Julio Davila, after he introduced you to J.P. Flores,

9    continued using J.P. Flores for that purpose?

10   A    Really, Davila would have communication with him and then

11   it came a point in time I started having direct communication

12   with him.

13   Q    When you met J.P. Flores, isn't it true that you also used

14   him to run registrations and paid him for that service?

15   A    Yes.

16   Q    So, your relationship with J.P. Flores pretty much

17   initially began engaged in criminal conduct with him, correct?

18   A    Yes, but at first I did not talk to him.  Then it came a

19   time when I would speak directly to him.

20   Q    And I think we're talking about two things.  I'm not

21   asking you about when you spoke to him directly -- we'll get to

22   that later.  At the time that you met him, you pretty much

23   started off with him running registration schemes; isn't that

24   true?

25   A    I never talked to him.  A point in time came later where I

1  started talking to him directly.

2  Q    But you were using him.  Even though you were not talking

3  to him, you were using him for the purpose of running

4  registrations.

5  A    Yes.

6  Q    And you were paying him for that.

7  A    Yes.

8  Q    Did you use J.P. Flores to run registrations for you from

9  the moment that you met Julio Davila?

10 A    There was always a time we would talk, but a point in time

11 came where we started doing that.  But we had done something

12 like it before 2010.

13 Q    And I just hope that you can be patient with me, but I'm

14 trying to get a time line here.  And so, you testified that you

15 met Julio Davila in June 2009 and J.P. Flores prior to 2010,

16 correct?

17 A    Yes.

18 Q    And when you met J.P., we would assume that you spoke to

19 him, correct?

20 A    We never spoke about that.  I just greeted him, but the

21 time came when we did.

22 Q    But you met him at the end of 2009, correct?

23 A    Yes.

24 Q    And prior to meeting him, you were already using him

25 through Julio Davila to run registrations for you, correct?

18

1   A    Well, that's what he would tell me because that's his

2   compadre.

3   Q    Well, you would ask Julio Davila to check a registration

4   for you and Julio Davila would come back and give you

5   information on that check, correct?

6   A    Correct, but Davila would be in charge of all that.

7   Q    And I understand that, but the registrations were being

8   checked regardless of whether you knew who was checking them.

9   Is that correct?

10  A    Yes.

11  Q    And it was your understanding with Julio Davila that it

12  was J.P. Flores, this individual who you hadn't met, who was

13  doing the checking on the registrations, correct?

14  A    Yes.

15  Q    And so, we can agree that sometime between June of 2009

16  through December of 2009 you were having registrations checked

17  through Julio Davila, correct?

18  A    Yes.

19  Q    And so, during that period of time you were already

20  engaged in criminal activity, which is why you needed those

21  registrations checked, correct?

22  A    Mr. Davila and me started doing that when I met him, but

23  as I said, that was before 2010 when we did a deal there.

24  Q    How many registrations would you say you had checked?

25  A    There weren't too many.  I do not recall exactly.

1   Q    Mr. Guerra, you talked to the -- you were interviewed by

2   agents on several occasions.  Isn't that correct?

3   A    Yes.

4   Q    Do you recall being interviewed on March 18th of 2013?

5   A    I cannot really recall dates, but yes, I was interviewed

6   by agents on several occasions.

7   Q    Would you agree with me that it was at least three times?

8   A    Yes.

9   Q    Isn't it true that you once had Aida Palacios to store 15

10  kilograms of cocaine at her residence that she shared with

11  Julio Davila?

12  A    Yes.

13  Q    And is this the time -- is this the cocaine that was

14  picked up at your residence or the one that was picked up at

15  the Academy parking lot?

16  A    Could you repeat the question, please?

17  Q    Are the 15 kilograms of cocaine that I just asked you

18  about the cocaine that was picked up at your house or the one

19  that was picked up at the Academy parking lot?

20  A    I do not recall exactly, but it was not at my house.

21  Q    Well, isn't it true that Aida Palacios and Julio Davila

22  would go to your home and pick up cocaine?

23  A    Just on one occasion at the shop.

24  Q    And so, does your shop have a driveway with a garage?

25  A    Yes.

1  Q    So, then it's possible that that's the location where --

2  other than that one time -- Julio Davila and Aida Palacios

3  would pick up cocaine?

4  A    I did not -- could you repeat the question?

5  Q    If Aida Palacios told agents that she went with Julio

6  Davila to your driveway, picked up cocaine and took it back to

7  their home, it's possible that that was the location where they

8  picked it up?

9  A    Yes.

10 Q    And just to be clear, your shop is the place where they

11 could have picked up the cocaine?

12 A    Yes.

13 Q    Do you recall an incident that occurred in 2011 where your

14 son had stolen some marijuana and was having problems with the

15 owner of the marijuana and so Julio Davila and Aida Palacios

16 were hired to scare them away?

17 A    Where was this?

18 Q    At a grocery store -- Junior's Grocery Store in Edinburg.

19 A    Yes.

20 Q    Mr. Guerra, you were actually right in the middle of any

21 of those deals when it came to contacting Julio Davila; isn't

22 that correct?

23 A    Yes.

24 Q    And you're the one that actually called Julio Davila to

25 have Aida Palacios and whoever else go scare those individuals

21

1   away, correct?

2   A    Yes.

3   Q    And it was Aida Palacios and who else that showed up to

4   scare them away?

5   A    I believe it was Charlie Vela.

6   Q    It was usually Aida Palacios and Charlie Vela that worked

7   together, correct?

8   A    Yes.

9   Q    And you were successful in having those individuals scared

10  away; isn't that correct?

11  A    Yes.

12  Q    And how much was Julio Davila paid on that occasion?

13  A    I do not recall.

14  Q    And whatever Julio Davila may have been paid, that didn't

15  come from your pocket, did it?

16  A    Yes.

17  Q    Okay.  So, your son would be the one who paid you -- paid

18  you money in order to pay Julio Davila?

19  A    Yes.

20  Q    So, then it didn't come from your pocket, correct?

21  A    Correct.

22  Q    Isn't it true that your son gave you $20,000 on that

23  occasion to give to Julio Davila?

24  A    I do not recall exactly the amount.

25  Q    And whatever the amount may have been, you always took a

22

1    cut from that money.  Isn't that correct?

2    A    On some occasions I would and some other occasions I would

3    not, but I almost always did.

4    Q    And so, the money that you took, you took that money

5    without letting your son know, correct?

6    A    Yes, he did not know.

7    Q    And so, as far as your son was concerned, that money was

8    intended to go to Julio Davila and you just took some off the

9    top and gave Julio Davila the rest, correct?

10   A    Yes, but Mr. Davila would give me a portion of whatever I

11   had given him he would give me part of it back.

12   Q    So, then you would take a percentage before you gave it to

13   Davila and then of what Davila received he then gave you some

14   money, correct?

15   A    No, I would give the money to Davila and Davila would give

16   me part of it.

17   Q    Are you saying that if your son gave you, let's say,

18   $20,000 that you would then hand those $20,000 to Davila

19   without touching any and keeping for yourself?

20   A    No, I would give the entire amount to Mr. Davila.  I would

21   deliver it and for me he would give me some of it, but on some

22   other occasions I would take money when I was told that I could

23   take from it.

24   Q    And who is "they"?  Who were they that would tell you you

25   could take from it?

1  A    I would give the money to Mr. Davila and he would give me

2  a percentage of it, but when the money was coming directly to

3  Mr. Davila, I will deliver it.

4  Q    So, even when your son gave you money for Davila, you

5  would just -- you felt compelled to just hand it to Davila in

6  that way?  In the exact amount that was given to you?

7  A    When it was a direct deal, I was supposed to deliver the

8  money intact and I would tell him this is what was sent for you

9  and he would give me money from that.

10 Q    So, it sounds to me like the way that you handled the

11 money had some connection with how the deals were made.  Is

12 that correct?

13 A    Yes.

14 Q    So, when you say if a deal was direct, what do you mean by

15 that?

16 A    A direct deal would be when he was asked how much would

17 you charge for this.  That was a direct deal.  And whatever

18 amount he had said would be sent to him.  From there he would

19 share.

20 Q    Well, explain to me what an indirect deal would be.

21 A    An indirect deal was when he was involved and also some

22 other friends of him were involved.  That's when we would have

23 to take a share.

24 Q    Okay.  Just so that I understand this -- tell me if I'm

25 correct -- a direct deal would be when you were the only one in

1    the middle?

2    A    Yes.

3    Q    And an indirect deal would be when both you and Julio

4    Davila were in the middle?

5    A    Because the owners of the materials -- this is in relation

6    to the bonds that he will manage.  They were friends of his, so

7    these were indirect deals in that he and I would take a

8    portion.

9    Q    Okay.  Well, I think now we're talking about something

10   else.  So, are you saying that you received money for bonds

11   that he would get or --

12   A    No, it's not about getting money from the bonds.  The

13   people that he had bonded out, drug dealers, were his friends.

14   And so, that's -- we would get involved and he would tell me

15   about these and that's how I would get a share, a percentage,

16   20 or 30 percent.

17   Q    What were you getting money for, though?

18   A    From drugs.

19   Q    So, from selling drugs?

20   A    It came from and being introduced to a person that he had

21   bonded out and so that's how it would go.  I would get a

22   percentage and he would get a percentage through this friend.

23   Q    Okay.  So, Julio Davila, through his work in being a

24   bondman and getting people out, would then introduce you to

25   some of these individuals who were engaged in criminal activity

1    for you to deal with?

2    A    Yes.

3    Q    And through these introductions, then you were able to

4    traffic drugs with these individuals he would introduce you to?

5    A    Yes.

6    Q    And so, essentially, what Julio Davila was doing is

7    introducing someone to you who you could steal drugs from.  Is

8    that correct?

9    A    Yes.

10   Q    Okay.  I have that straight.  But back to my original

11   question about when Julio Davila was called to assist in

12   scaring individuals away from your son, Junior, how is it that

13   you would get a percentage of the money that was passed in that

14   case?

15   A    Because whenever he collected I was supposed to have taken

16   the money to him and he would give me a share of that money.

17   Q    Okay.  So, in those instances where you asked Julio Davila

18   to scare people away from your son you're saying that you never

19   took money off the top before giving it to Julio?  Is that

20   correct?

21   A    Yes.

22   Q    So, then, whatever Junior gave you to give Julio is the

23   amount that Julio received every time?

24   A    Well, on some occasions that's when he would say, "I want

25   this much money."  Then he would have to be paid that amount.

1    But it varied a lot.  It would vary a lot.

2    Q    But it sounds to me like you're saying that there were

3    some occasions where you would take some money off the top

4    before giving it to Julio.  Is that correct?

5    A    Could you repeat the question?

6    A    It sounds like you're telling us that there were some

7    occasions where you would take some money off the top before

8    giving it to Julio Davila.

9    A    But I never took it without permission.  Whenever there

10   was a transaction, he would give me part of it.

11   Q    And so, then, your testimony is that any money that you

12   got Julio Davila was aware of because he consented to it?

13   A    Well, when the money was coming directly to him for what

14   he had charged, he would be delivered that amount of money and

15   from it he would give me some money.

16   Q    And as you mentioned before, there were some indirect

17   deals where both you and Julio Davila were the middle men.  In

18   those cases, you would take your percentage and then give him

19   his, correct?

20   A    Yes.

21   Q    So, tell me, what would you consider the dealings where

22   you hired Julio Davila to scare away those individuals for your

23   son?  Was that considered a direct deal or an indirect deal?

24   A    Indirect.  Whenever he would charge certain amount for a

25   job which happened on several occasions only that was a direct

1  deal.  An indirect deal was when he introduced me to a friend

2  of his and then he would take a share and I would take a share.

3  Q    So, when you hired Julio Davila to scare away those

4  individuals that was a direct deal and the only way you got

5  money was when Julio Davila gave you the money.

6  A    Yes, he would obviously give me money.

7  Q    But you also were charging for the service of getting work

8  to him, correct; even though it wasn't drugs, it was still

9  work.

10 A    Davila would set a price and that price would be paid and

11 from that money Davila would give me money.

12 Q    Well, right.  But Julio Davila gave you money because you

13 were expecting to be paid for getting him that job.  It wasn't

14 that he was just giving you money because he had so much money

15 he wanted to give it away.

16 A    No, because I had brought the job to him so I would make

17 money from it, too.

18 Q    There was another incident that occurred in a Walgreen's

19 in Edinburg, Texas where, again, Davila was asked to provide

20 individuals -- being Palacios and Vela -- Palacios and Vela --

21 to scare away some other owners of drugs that your son had

22 stolen.  Do you recall that?

23 A    It was a Dodge Charger.  Yes, it was in Edinburg.

24 Q    And in this occasion, Junior had stolen 14 kilograms of

25 cocaine that were out in Ohio somewhere, correct?

1    A    I cannot recall exactly the amount.

2    Q    But you do recall that it was cocaine?

3    A    Yes.

4    Q    Okay.  And in this case, again, Junior gave you money to

5    give to Julio Davila, correct?

6    A    Yes.

7    Q    Is it your testimony that you were engaged -- and you may

8    have answered this and I don't remember -- that you were

9    engaged in criminal activity with Julio Davila during the same

10   period that you were engaged in criminal activity with J.P.

11   Flores?

12   A    Everything's very different.

13   Q    I'm simply asking about whether you were engaged in

14   criminal activity at the same time, not if you were engaged in

15   the same kind of criminal activity.

16   A    When he was talking to him I would not deal with him but

17   then I started dealing with him directly and they no longer

18   spoke.

19   Q    I understand that, but your connection was with both Julio

20   Davila and J.P. Flores.  So, my question is that even though

21   you began working directly with J.P. Flores you were still

22   engaging in criminal activity with Julio Davila.  Isn't that

23   correct?

24   A    No, we did not have communications.  Once I started

25   working with Mr. Flores we didn't do anything anymore.

1  Q    So, you're saying that these individuals that Julio Davila

2  would introduce you to so that you could rip them off, that

3  ended once you met J.P. Flores.

4  A    In a way -- I'm sorry, but it became very falling apart

5  because we didn't have a lot of communication, but I did do

6  some jobs occasionally.

7  Q    Okay.  So, you agree that you engaged in criminal activity

8  with both Julio Davila and J.P. Flores during the same period

9  of time?

10  A    Not regularly, but on certain occasions.  It was not very

11  common.

12        THE COURT:  I'm trying to remember your testimony

13  from yesterday, but did you ever engage in any criminal

14  activity with Mr. Davila after the incident where the $130,000

15  in cash was taken that you felt was going to be yours?

16        MR. STURGIS:  Judge, may we approach?

17        THE COURT:  You may, after this answer.

18        THE WITNESS:  Your Honor, that was the last deal I

19  did with Mr. Davila.

20        THE COURT:  Do you remember the month and year of

21  that?

22        THE WITNESS:  I'm sorry, I do not remember it.

23        THE COURT:  All right.  Why don't we just take our

24  mid-morning recess, then?  All right.  It's 10:15.  I'm going

25  to take a brief recess.  I have another case to hear non-

1    related to this, so this is a good time to take up some other

2    matters.  This will be about a 15-minute recess.  It'll be your

3    only recess this morning and then we'll work until noon after

4    that.

5         **(Jurors exit courtroom at 10:10 a.m.)**

6         **(Portion omitted from 10:10 a.m. to 10:20 a.m.)**

7         **(A recess was taken from 10:20 a.m. to 10:34 a.m.)**

8         **THE CLERK:**  All rise for the jury.

9         **(Jurors enter courtroom at 10:34 a.m.)**

10        **THE COURT:**  All right.  Good morning, again.  Please

11   be seated.

12        All right, Ms. Gutierrez, you may resume your

13   examination.

14                   **CROSS EXAMINATION (CONTINUED)**

15   **BY MS. GUTIERREZ:**

16   Q    Mr. Guerra, the reason that you began directly dealing

17   with J.P. Flores was after Julio Davila didn't give J.P. Flores

18   all the money that you had given Davila to give to J.P. Flores.

19   Is that correct?

20   A    Yes, that was one of the reasons.

21   Q    What's another reason?

22   A    The last one, he kept some money from Nolana.  Yes.

23   Q    Okay, but that was well after you were already engaging in

24   criminal activity with J.P. Flores, correct?

25   A    Yes.

1  Q    And what I'm saying is that the reason that you directly

2  began communicating with J.P. Flores instead of going through

3  Davila was after that incident where J.P. Flores complained to

4  you about not having received all the money he was expecting,

5  correct?

6  A    Correct.

7  Q    And part of your relationship, aside from running

8  registrations was the fact that J.P. Flores would seek

9  donations from you for the Hidalgo County Sheriff's Office.  Is

10 that correct?

11 A    Yes.

12 Q    And initially that was pretty much the nature of your

13 relationship, both the registration checks and the fact that

14 you were sponsoring different events at the Hidalgo County

15 Sheriff's Office, correct?

16 A    Yes.

17 Q    And that happened for a period of time even before you all

18 conducted any traffic stops, correct?

19 A    Yes.

20 Q    How many times would you say J.P. Flores -- or you asked

21 J.P. Flores either through Julio Davila or directly to run

22 registrations for you?

23 A    Could you repeat the question, please?

24 Q    How many times would you say that J.P. Flores ran

25 registrations for you either through your request to Julio

1    Davila or directly to Flores?

2    A    There were several occasions.

3    Q    Can you estimate or give me a number?

4    A    There were a lot.

5    Q    Was it more than 50?

6    A    No.

7    Q    More than twenty?

8    A    Maybe so.

9         **(Pause)**

10   Q    Do you recall an incident that occurred February 24th of

11   2012 where you were contracted to transport 2,000 pounds of

12   marijuana and an individual gave you $5,000 for that service?

13   A    I do not recall the exact date, but I did receive those

14   $5,000.  But the deal did not go through.

15   Q    And on that deal, you paid Aida Palacios half of that

16   money -- 2,500 -- for having introduced you to that individual,

17   correct?

18   A    Exactly.

19   Q    With respect to the cocaine that Aida Palacios stored at

20   her home, you were paying her about $500 per kilogram of

21   cocaine.  Is that correct?

22   A    I do not recall exactly what the amount of money was, but

23   she was being paid money.

24   Q    Can you tell me about the incident that you mentioned

25   where Julio Davila kept some money on Nolana Road or at Nolana

33

1    (indiscernible)?

2    A    Yes, you asked me about that yesterday.  It was a Cadillac

3    being driven by a woman.  Charlie and Aida stop that car using

4    a Pharr patrol car but the guy from Pharr didn't know anything

5    about it.

6    Q    Was that a white Escalade?

7    A    It was bone color.

8    Q    Isn't it true that you don't know whether the Pharr police

9    officer knew what was going on or not; isn't that correct?

10   A    The officer did not know.  According to what Aida said, he

11   just made the stop.

12   Q    Well, you would have to rely on Aida's statement in order

13   to believe that, correct?

14   A    It's because we saw it happen when the people stop the

15   officer left and then Aida and Charlie stayed with the woman.

16   Q    But you were around during all these incidents where there

17   were either traffic stops or --

18   A    Yes.

19   Q    -- you were around when Julio Davila had his people scare

20   other people away, correct?

21   A    Yes.

22   Q    Who was running your business?

23   A    You mean my business and company?

24   Q    Well, yeah, unless you weren't running your business any

25   more because you were making enough money with the drug

1  trafficking activities.

2  A    Well, that money was splitting among different people but

3  my business is independent.  I have an office with personnel in

4  charge of running it.

5  Q    So, you don't need to be at your business office in order

6  to run your business, which is why you were able to be at

7  different locations at any given time to see these drug

8  transactions go down?

9  A    Well, I was never at the office because I only deal with

10  the shop and spare parts.  I wasn't there because they had

11  people trying to do their jobs there to deal with the numbers

12  and the accounting because the accounting in relation to the

13  diesel is very detailed.  I don't know anything about it.

14  Q    Is it your testimony that you don't know anything about

15  how to run your company?

16  A    I know exactly how to run the business and all the details

17  about it, but with the diesel you have to check every detail so

18  my job was basically to bring spare parts because that's how

19  money goes faster there in that kind of business.

20  Q    Mr. Guerra, on the deal with the Cadillac Escalade that

21  was stopped with $130,000, you ended up giving $1,000 as

22  payment to Davila for the individuals who assisted with the

23  stop.  Isn't that correct?

24  A    I believe so, yes.

25  Q    And can you tell me were you able to observe the traffic

35

1  stop?

2  A     Of course I did.

3  Q     And how was it that you were able to observe the traffic

4  stop?  Was there a pre-determined location where this Cadillac

5  Escalade was going to be stopped?

6  A     The Cadillac I had been communicating.  I was speaking

7  with the person, Carlos from Reynosa.  And so, he knew when the

8  lady in the car were coming down Nolana, so I radioed Davila

9  who, in turn, notified Aida and Charlie and then they stopped

10  her.

11  Q     So, are you saying that this Charlie individual conspired

12  with you to steal the money from this woman?

13  A     No, not at all.

14  Q     Okay.  So, what did Charlie have to do with this?

15  A     Charlie Vela and Aida stopped that car along with Pharr

16  police officer who was not aware what was going on, so they --

17  he just did the stop and Carlos is my friend in this deal.

18  Q     I may have made a mistake.  I meant to ask you did Carlos,

19  your friend, conspire together with you to steal the money from

20  this lady?

21  A     Yes.

22  Q     What is Carlos' last name?

23  A     No one ever gives you their last name.

24  Q     And I understand that, Mr. Guerra, but yesterday you

25  testified about how you were very meticulous about getting

1   people's information, both first and last names, because you

2   understood that people don't give you their real names a lot of

3   times.

4   A    Well, he was a friend of mine.  It was a job, a deal that

5   was done.

6   Q    So, with more reason being a friend of yours shouldn't you

7   know his last name?

8   A    None of us mention last names.

9   Q    So, you are interested in finding out full names of

10  individuals who you are planning to rip off drugs?

11  A    Exactly.

12  Q    However, those that you work closely with you have no

13  interest in finding out what their real names are.  Is that

14  what you're telling us?

15  A    No, not exactly.  I'm not interested in finding out their

16  real name, but that job belongs to that first son, so what we

17  are interested in is finding out the name of the person that is

18  coming in the car that's going to be part of the deal.

19  Q    Okay.  So, this Cadillac, you couldn't have known the

20  route that it was taking for you to predetermine where to stop

21  it, could you?

22  A    I did know, because the friend that was with me we had

23  been told exactly where it was coming, so they said it'll be

24  further down on Nolana.  Ahead on Nolana they stopped it.

25  Q    Was your friend Carlos in communication with the blond

37

1   lady that was inside the Cadillac?

2   A     Exactly.

3   Q     So, that's how you were able to know exactly the

4   whereabouts of the Cadillac.

5   A     Yes.

6   Q     And so, tell me where it was stopped.

7   A     There's a place past Nolana, it's a large -- there's a

8   breakfast place with a large parking lot.  I don't recall

9   exactly the location, but it was on Nolana at that place with a

10  big parking lot.

11  Q     You state that it's past Nolana, which indicates that

12  we're talking about a street that runs north and south.  What

13  street are we talking about?

14  A     Across Nolana there's a store, a gas station, and then a

15  pancake place.  It's about half a block past Nolana on 281.

16  Q     So, was the Cadillac stopped on the frontage road of the

17  expressway?

18  A     It got off.  It had been coming from the north.  It got

19  off Nolana and was supposed to go under it -- from Nolana my

20  friend had told her.  So, it went past Nolana and a little bit

21  further up ahead.  That's where everything had been planned.

22  Q     So, Carlos was present also at the stop.  Is that correct?

23  A     Yes, he was with me.

24  Q     And he's from Reynosa, so does he live here?

25  A     No.

38

1   Q    Does he have status to be able to be present in the United

2   States?

3   A    I'm sorry about that question.  I never asked that from

4   anybody.

5   Q    But this indicates that you worked closely with this

6   individual.  This wasn't just a relationship by telephone where

7   he's at a distance and you're never near him.  Isn't that

8   correct?

9   A    What happens is that I never ask anybody for their legal

10  status.  They call me and tell me, "I'm coming," and I say,

11  "Okay.  I'll be waiting for you here."  So, I would never ask

12  them.

13  Q    I'd ask you to listen to my question.  My question was the

14  fact that Carlos, your friend whose last name you don't know,

15  was present at the stop indicates that you worked with him

16  closely, as in you were in a physical presence with him.  It

17  wasn't just a relationship where he was in Mexico and you were

18  here and you communicated by phone.  Isn't that correct?

19  A    I never used phones.  I would use radios.

20  Q    How many dealings did you do with Carlos?

21  A    I do not recall.

22  Q    Was it more than five?

23  A    No.

24  Q    Well, what other deal did you do with Carlos that you can

25  remember?

39

1          **MR. STURGIS:**  Judge, I'm going to object to the

2  relevance of this --

3          **THE COURT:**  What was the question?

4          **MS. GUTIERREZ:**  What other deals did you did with

5  Carlos that you can remember.  He can't tell me how many times

6  he dealt with him.  This might be a co-conspirator.  Well, he

7  is a co-conspirator.

8          **MR. STURGIS:**  I don't believe he's a co-conspirator

9  in this case, your Honor, but again even that isn't relevant at

10  this point.

11          **THE COURT:**  What other deals did you do with him --

12  and your question is how many?

13          **MS. GUTIERREZ:**  Well, I asked how many; he says he

14  doesn't remember, so if we can go by what he remembers, then

15  maybe we can narrow it down.

16          **THE COURT:**  Maybe you can just ask him to estimate,

17  "Was it less than 20?  Was it less than ten?"

18          **MS. GUTIERREZ:**  Very well, your Honor.  I asked him

19  if it was more than five or six.  I'll leave it at that.

20  **BY MS. GUTIERREZ:**

21  Q    And you stated that that incident with the white Escalade

22  was the last time that you --

23          **THE COURT:**  Bone colored.

24  //

25  //

40

BY MS. GUTIERREZ:

Q    Bone colored.  I apologize.  Was the last time that you

had any dealings with Julio Davila.  Is that correct?

A    I believe so, yes.

Q    So, it's possible that you did have some dealings with

Julio Davila after the Cadillac -- bone colored Cadillac

incident?

A    I don't recall exactly.  I don't want to lie.

Q    Mr. Guerra, during this period of time you also were

introduced to an individual by the name of Fabian Rodriguez,

correct?

A    Well, he's part of Panama.

Q    Well, you're not talking about the country, right?

A    I'm talking about the Panama Unit.

Q    Okay.  So, yes, you were introduced to Fabian Rodriguez at

some point.  Is that correct?

A    Yes.

Q    Can you tell me when that was?

A    I cannot recall exactly.

Q    And you were introduced to Fabian Rodriguez through J.P.

Flores, correct?

A    Exactly.

Q    Where were you introduced to Fabian Rodriguez?

A    I do not remember.

Q    Was it at the Hidalgo County Sheriff's Office?

41

```
1   A    No.

2   Q    Was it at your business?

3   A    I don't recall exactly where it was that I (indiscernible)

4   this man for the first time.

5   Q    However, you do recall having run into Mr. Garza at the

6   Love's, correct?

7   A    Exactly.  He was driving the motorcycle.

8   Q    Was Fabian Rodriguez in uniform when you met him?

9   A    Yes.

10  Q    Was he driving an Hidalgo County Sheriff's Office unit?

11  A    Sometimes he would drive a white Dodge truck.

12  Q    And I understand you had many dealings with Fabian

13  Rodriguez, but I'm asking you about the first time that you

14  met.

15  A    The first time I met him (indiscernible).

16          THE COURT:  Can you repeat your answer?

17          THE WITNESS:  Fabian was from Hidalgo and Jonathan

18  would call him when he started the Panama Unit to help him.

19  BY MS. GUTIERREZ:

20  Q    When you met Fabian Rodriguez, was he part of the Panama

21  Unit at that time or was he only a deputy or in the Crime

22  Stoppers at the County?

23  A    He was with the Crime Stoppers.  I don't know exactly what

24  his job was, but Jonathan would call him to ask for his help.

25  Q    And by Jonathan, you're talking about Jonathan Trevino,
```

42

1    the sheriff's son, correct?

2    A    Exactly.

3    Q    So, what was your relationship with Jonathan Trevino?

4    A    None.  Nothing.

5    Q    Because you seem to bring in Jonathan when I'm asking you

6    about your first meeting with Fabian Rodriguez.  So, I want to

7    know did you meet these two individuals at the same time?

8    A    I never talked to Jonathan at all, all through the time

9    when I came to meet him here.  But I never talk with him in

10   person.

11   Q    Okay.  Well, then, I guess I need you to explain to me

12   what you were talking about when you say that Jonathan would

13   seek Fabian Rodriguez's help, I think, if I understand you

14   correctly?  Was that the Panama Unit?

15   A    Yes, because J.P. would tell me.

16   Q    Okay.  This is not something that you know personally.

17   This is something that you heard from someone else.  Is that

18   correct?

19   A    Could you repeat the question?

20   Q    What you stated about Jonathan and Fabian Rodriguez is

21   something that you heard from someone else.  It was not

22   something that you yourself personally witnessed.

23   A    No, I did not witness that.

24   Q    And can we agree that whatever you did not witness you

25   can't say for sure happened?

1    A    The only thing that I can tell you that did happen

2    whenever they had done their job, Fabian would bring it to me

3    through Companero.  I never got to speak to Jonathan.

4    Q    Well, right, but isn't it also true that Fabian Rodriguez

5    would take you drugs directly?

6    A    No, he never brought me drugs directly.

7    Q    Wasn't there a time where Jonathan Rodriguez brought you

8    some cocaine --

9            **THE COURT:**  Jonathan Rodriguez?

10   **BY MS. GUTIERREZ:**

11   Q    I'm sorry, Fabian Rodriguez brought you some cocaine that

12   you all thought was heroin and then eventually it was

13   determined that it was cocaine?

14   A    That was a job in Weslaco.  With J.P. we always had --

15   when you speak to a person you have to speak with that person

16   and that person in turn is going to call the other one.  By the

17   time Fabian showed up with something it's that because he

18   already had permission.

19   Q    So, it is true that Fabian Rodriguez brought you drugs on

20   several occasions, correct?

21   A    Correct, but J.P. would always have to be notified or made

22   aware of this.  And he would tell me, "The Companero is on his

23   way."

24   Q    And from what I'm understanding, J.P. Flores was the

25   contact person for a lot of these individuals that you utilized

44

1    within your own conspiracy, correct?

2    A    Correct.  Exactly.  Nothing could be done if he was not

3    notified about it.

4    Q    So, J.P. Flores was a pretty powerful guy, huh?

5    A    Yes.

6    Q    Similarly to how you were positioned within your

7    conspiracy, you were pretty much the head involved in

8    everything, correct?

9    A    What I could do in this case is whenever there was a job

10   coming from the Panama Unit, J.P. would call me to see if we

11   could do it.

12   Q    Well, right.  But what I'm talking about is that you never

13   took any orders from Julio Davila, did you?

14   A    Davila had nothing to do with Panama.

15   Q    I understand that, but that's not what I'm asking you.

16   What I'm saying is that Fernando Guerra, Sr. never took any

17   direction or instruction from Julio Davila.  Isn't that a

18   correct statement?

19   A    What's the context there?  I don't understand the way

20   you're asking that question.

21          THE COURT:  Can you rephrase it?  It's ambiguous.

22   BY MS. GUTIERREZ:

23   Q    Within the drug dealings that you did with Julio Davila,

24   Julio Davila did not direct you or instruct you on what to do.

25   Is that correct?

45

1  A    On several occasions he would tell me.

2  Q    Okay.  So, was Julio Davila your boss?

3  A    Well, he would be the one to tell me about the jobs and I

4  would do it.

5  Q    Okay.  So, are you telling me that when Julio Davila would

6  tell you about a job you could not say no?

7  A    No, I'm not saying that I couldn't say no.  If it was

8  advantageous for us, we would go ahead and do it.

9  Q    So, you had your own independent decision making

10 authority, correct?

11 A    To a certain extent, yes.

12 Q    Are you saying that there were some instances where you

13 were forced to do something that you didn't want to do?

14 A    No, I'm not telling you that at all.

15 Q    So, basically what Fernando Guerra, Sr. wanted to do, he

16 did; and what Fernando Guerra, Sr. didn't want to do, he didn't

17 do.  Correct?

18 A    When we had an agreement -- when we were in agreement, we

19 would do it.  And when there was something that was not

20 advantageous to me, we would not do it.

21 Q    However, when dealing with a traffic stop where a deputy

22 was needed to conduct the fake traffic stop or when you needed

23 Panama Unit to assist you, you had to go through J.P. Flores,

24 correct?

25 A    Exactly.

1    Q    You yourself did not have access to any Hidalgo County

2    Sheriff's Office deputy other than J.P. Flores.  Isn't that

3    correct?

4    A    Exactly.

5    Q    When was the first time you worked with the Panama Unit?

6    A    I do not remember.

7    Q    Do you remember what the details of the drug deal were?

8    A    Yes, I remember several things, but I do not recall

9    exactly all the details.

10   Q    Mr. Guerra, were you provided a report of your previous

11   interviews for you to review in anticipation of your testimony

12   in this case?

13   A    No.

14   Q    Isn't it true that you purchased narcotics from the Panama

15   Unit somewhere around 30 times?

16   A    Maybe so, yes.

17   Q    And it was usually cocaine; isn't that correct?

18   A    It was (indiscernible) between cocaine and regular

19   material.

20   Q    And what is regular material?

21   A    Marijuana.

22   Q    Isn't it true that at least on one occasion you -- well,

23   the Panama Unit brought you methamphetamine to try to sell it

24   to you?

25   A    On one occasion and I said goodbye.

47

1   Q     And just so that we're clear, when we're talking about the

2   Panama Unit bringing you product, whether it's cocaine,

3   marijuana or methamphetamine, you were the one who initially

4   sent them to steal those drugs.  Isn't that correct?

5   A     No, that was on a very rare occasion.  They would do their

6   own jobs on their own independently.

7   Q     However, sometimes you would, through J.P. Flores, tell

8   them where there was a location that had drugs, correct?

9   A     There were several occasions.

10  Q     Can you tell me how many times?

11  A     Maybe three to five times.  That would not be -- they

12  would do their own work independently.

13  Q     Okay.  You did personally communicate with Fabian

14  Rodriguez, correct?

15  A     I had to first call J.P., ask Companero for permission

16  before I could speak with Fabian.

17         **MS. GUTIERREZ:**  And your Honor, the translation --

18         **THE COURT:**  It was a little bit off, yes.

19         **MS. GUTIERREZ:**  -- should include Companero at the

20  end, because both individuals were called Companero.

21  **BY MS. GUTIERREZ:**

22  Q     But you did talk to Fabian Rodriguez, despite the fact

23  that having to go through J.P. Flores, you did personally

24  communicate with Fabian Rodriguez, correct?

25  A     Not about business.  We would talk to each other, greet

1    each other, but probably we'd first have to go through J.P.

2    Flores.

3    Q    Isn't it true that Fabian Rodriguez called you Delta?

4    A    Yes.

5    Q    And he called you Delta because you asked him to call you

6    Delta, correct?

7    A    We would use codes and that's the code that was assigned

8    to me.  I don't know exactly whose idea it was.

9    Q    Well, and the Delta came from the fact that you had a lake

10   house out on Delta Lake, correct?

11   A    I don't know.  I don't like to tell you that that's the

12   reason.  I don't know exactly why they did that.

13   Q    But you did have a lake house on Delta Lake, correct?

14   A    Yes, I had one.

15   Q    And isn't it true that Julio Davila also had a lake house

16   on Delta Lake?

17   A    Yes, he also had one there.

18   Q    And isn't it true that you hosted the Panama Unit at your

19   Delta Lake house on several occasions?

20   A    Correct.

21   Q    So, you were in contact with Jonathan Trevino; isn't that

22   correct?

23   A    Let me repeat.  I would never talk to Jonathan Trevino.

24   Q    So, you had the Panama Unit at your home, however you

25   didn't talk to any of them except Fabian Rodriguez.  Is that

1    what you're testifying?

2    A    I was never present when those people were there.  I would

3    just hand over the keys and then I would go there.  But I was

4    never close.

5    Q    Isn't it true that you lent out some jet skis to Jonathan

6    Trevino so that he could take his family on vacation to the

7    Island on one occasion?

8    A    He went with his dad but I never spoke with him directly.

9    It was taken to him by Companero.

10   Q    So, then you lent some jet skis to Jonathan and Lupe

11   Trevino.  Is that correct?

12   A    Yes.

13   Q    And are you aware of who J.P. was communicating with with

14   respect to these jet skis?  Was it the sheriff himself?

15   A    No, J.P. called me, the Companero, that Jonathan was going

16   to the Island with his dad if I could lend them the jet ski and

17   so I did.

18   Q    Okay.  Was Jonathan Trevino also referred to as Companero?

19   A    No, I would never speak to Jonathan.  Companero is only

20   J.P. and Fabian.

21          **MS. GUTIERREZ:**  Your Honor, could I have a moment.

22   It's a little difficult for me to get --

23          **THE COURT:**  All right.

24          **MS. GUTIERREZ:**  -- the unredacted stuff.

25          **THE COURT:**  All right.  Let's take a quick break,

1    maybe ten minutes.  All right.  Jury's excused for ten minutes.

2         **(Jury exits courtroom at 11:16 a.m.)**

3         **(Portion omitted from 11:16 a.m. to 11:17 a.m.)**

4         **(A recess was taken from 11:17 a.m. to 11:34 a.m.)**

5              **THE CLERK:**  All rise.

6         **(Jurors enter courtroom at 11:34 a.m.)**

7              **THE COURT:**  All right.  Good morning again.  Please

8    be seated.

9              All right.  Ms. Gutierrez, whenever you're ready.

10             **MS. GUTIERREZ:**  Thank you, your Honor.

11                   **CROSS EXAMINATION (CONTINUED)**

12   BY MS. GUTIERREZ:

13   Q    Mr. Guerra, let's go back to that seizure of somewhere

14   around $130,000 that was supposed to be in the bone-colored

15   Cadillac off of Yolanda.  You indicated that you were in

16   communication with Carlos by radio, correct?

17   A    Carlos was with me.

18   Q    Isn't it true that you indicated to agents that it was

19   actually a female by the name of Rosio who was with you that

20   day?

21   A    I don't know exactly what woman was driving, but I was

22   riding with Carlos.

23   Q    So then it wasn't just the woman you were driving with,

24   you were driving with a male also in your vehicle; isn't that

25   correct?

1   A    No.  I only had Carlos with me.

2   Q    Okay.  Well, isn't it true that you told agents that you

3   and Rosio, whose last name you didn't know, were in your

4   vehicle and were being updated of the load vehicle from Rosio's

5   associates?

6   A    But I had no woman riding with me.  I had Carlos with me.

7   Q    So if the report of your interview indicates that you

8   stated --

9            **MR. STURGIS:**  Judge, that's improper.  Objection.

10           **THE COURT:**  Sustained.

11  Q    Are you saying that you never told anyone, no agents, that

12  you were in a vehicle with a female on that occasion?

13  A    I was with Carlos.  Aida and Charlie were together in

14  another vehicle.  Davila was in another vehicle.  I was with my

15  friend.

16  Q    Do you know Rosio?

17  A    I don't know who she may be.

18  Q    I'm asking if you know a female by the name of Rosio.

19  A    I don't know anyone named Rosio.

20  Q    So, earlier you testified that Carlos was near by and now

21  you're saying that he was actually in your vehicle, correct?

22  A    No.  When I was riding with this man, my friend, he was

23  calling this woman.  I never said that he was not with me.  He

24  would call this woman.  Carlos would call this woman and I, in

25  turn, would call Davila.

1    Q    Is Carlos your boss?

2    A    No.  Carlos was part of that job.

3    Q    Who do you work for in the drug trafficking business?

4    A    For no one.

5    Q    We spoke earlier about an incident where a Walgreens was

6    the location for Julio Davila to send Aida Palacios and Charlie

7    Vela to scare off some individuals that your son was having a

8    problem with.  Do you recall that?

9    A    Exactly.

10   Q    And you were present at that location, correct?

11   A    Of course, yes.

12   Q    And you were able to observe what happened, correct?

13   A    Yes.

14   Q    Isn't it true that an Edinburg police unit was used in

15   that incident?

16   A    Yes.

17   Q    And that wasn't through your connection, correct?

18   A    Exactly, no.

19   Q    So who is the person who got the Edinburg PD unit to

20   cooperate in this sham?

21   A    Oh, okay.  I believe it must have been Charlie because

22   Charlie worked for the court in the county in Edinburg, so I

23   didn't know the officer from Edinburg.

24   Q    And so, since you were present at that incident, can you

25   tell me what exactly Aida and the Edinburg police office and

1 Charlie Vela did to scare these individuals away?

2 A    Well, when that happened, maybe I was seeing this because

I was there at the gas station when these people were stopped.

I didn't get to talk to them at all.  There was no -- but these

people saw this.  They thought it was suspicious and they

abandoned the vehicle there.

7 Q    Okay.  I guess let's start step by step.  Isn't it true

that the meeting was set up after Junior had stolen some drugs

from these individuals?

10 A    Yes.

11 Q    And the purpose for the meeting was simply to talk about

those drugs that had been lost, correct?

13 A    I don't know exactly what he may have discussed with them.

He told them that he had told them to go to a certain spot and

that's when I called Davila and Davila contacted Charlie Vela.

16 Q    Well, but you knew that it was not for the purpose of

doing a drug exchange, correct?

18 A    Yes, it was not for that.

19 Q    And you knew that the purpose of it was because these

individuals were giving your son a hard time and they had to be

scared, correct?

22 A    Correct.

23 Q    And so you knew that -- regardless of the specifics, you

knew that those individuals were asked to come and meet at that

location for that purpose, correct?

1    A    Correct.

2    Q    Were you aware of who the individuals were?

3    A    No.  He just told me about their vehicle and that's why we

4    were waiting ourselves.

5    Q    And so I'm assuming that you were parked at the Exxon

6    across the street from the Walgreens; is that right?

7    A    Correct.

8    Q    Okay.  So tell me, or tell the jury, how it was staged.

9    Was Aida already there?  Was Julio already there or did you-all

10   wait for the individuals to drive in?

11   A    Well, exactly.  They arrived there.  There were two men.

12   They got out of their car.  Charlie was taking time to come, so

13   I believe they felt there was something suspicious there and so

14   they abandoned the car and left.

15   Q    Where was Junior?

16   A    I don't know where Junior was.  I was talking to him over

17   the radio, but I don't know where he was.

18   Q    Well, wasn't the purpose of the meeting for these two men

19   to speak with Junior?

20   A    Exactly, but Junior never showed up.  Junior was on his

21   way.

22   Q    Isn't it true that Aida Palacios drove in followed by the

23   Edinburg PD unit?

24   A    What I saw?  I saw the patrol car arrive and the officer

25   got out of the patrol car.  And Charlie had told him, I think,

55

1    that they were inside their vehicle, but they noticed the

2    suspicious activity and they just left.

3    Q    What kind of vehicle was it?

4    A    It was a Dodge Charger.

5    Q    And where was Aida?

6    A    Aida?  I don't remember exactly whether she was riding

7    with Charlie or with Davila.

8    Q    So Julio Davila was also around the area; is that correct?

9    A    He was also circling around.

10   Q    When you say that these individuals "got out of their car"

11   and "left," did they leave walking?

12   A    Yes, because I saw them.  I was there across the street at

13   the store.  I think they, like, noticed something suspicious.

14   They got into the store and I don't know where they went to.

15   Q    The incident that occurred at the Junior's grocery store

16   was set up in a similar way, right?

17   A    Correct.

18   Q    And you were also present at the Junior's grocery store;

19   is that correct?

20   A    Correct.  I was nearby, observing.

21   Q    Who were you with?

22   A    I don't recall who I was with.

23   Q    But you weren't alone?

24   A    No.  I was not alone, but I don't remember who was with

25   me.

56

1    Q    The incident at Walgreens, who were you with then?

2    A    With me?  I was by myself that day.

3    Q    Okay.  And at the Walgreens, what is it that -- how is it

4    that the individuals were scared off?

5    A    Well, because they saw Charlie.  He was driving a Tacoma.

6    And then they saw this suspicious car.  My son was telling them

7    that he would be there soon, but Charlie took a few minutes so

8    they noticed something suspicious and left.

9    Q    Well, can you explain to the jury what is suspicious about

10   a Toyota Tacoma?

11   A    It's just that it's a four-door truck.  When you see them

12   around, that's the type used by Rene Guerra, the prosecutor.

13   Q    So are you saying that, as we're driving down any road in

14   the valley within Hidalgo County, any Toyota Tacoma that we see

15   with four doors are Toyota Tacoma's used by the District

16   Attorney Rene Guerra?

17   A    No, not exactly.  But when you see a truck of that type

18   and, besides the fact that you're seeing it, then you notice

19   this special tool box that is used by the officers of the

20   District Attorney.

21   Q    And you're saying that the individuals saw this Toyota

22   Tacoma and left the area in their vehicles or on foot?

23   A    No.  I don't know, but Charlie was driving around the

24   place.  And when you see those trucks, there is something very

25   clear about them; like, there is little signs that tell you

57

1    that they belong to officers.  So that car was going there,

2    circling around, and then Davila's truck was also circling

3    around.  So my son was not arriving.  They noticed that,

4    because it was suspicious and they left.

5    Q    Does Julio Davila's truck also have these signs or these

6    identifying features in the truck that identify it as an

7    officer's vehicle?

8    A    No, not that truck.  Well, but the place was empty.  There

9    was no movement and they went around twice.

10   Q    Okay.  So are you saying that Charlie Vela and Julio

11   Davila circled around these individuals in their trucks?

12   A    Yes.

13   Q    And so that's how they scarred them away, because they

14   were circled by two vehicles that were just driving around

15   them; is that correct?

16   A    Well, okay.  The patrol car took some time in arriving, in

17   showing up, and then we had the others going around.  And we

18   think they thought that was suspicious, so they asked my son,

19   are their cars here?  And my son said, I don't know.  So then

20   the patrol car shows up and they thought that they were inside

21   their car but they must have been out because we were not able

22   to find them.

23   Q    And what patrol unit was used in this incident?

24   A    A regular patrol car from Edinburg; black and white.

25   Q    Okay.  So your testimony is that, in both the Walgreens

58

```
 1  incident and the Junior's grocery store incident, you utilized
 2  an Edinburg Police Department patrol unit, correct?
 3  A    No.  Okay.  The Edinburg one, I do not remember.  You were
 4  talking about the one at the pharmacy.
 5  Q    I think we got confused here.  I am speaking about the
 6  incident at the Junior's grocery store.  That's where I
 7  understand that you're telling me that both Charlie Vela and
 8  Julio Davila, in their trucks, were circling around the owners.
 9  A    No.  I was talking about the one at the pharmacy.
10  Q    Okay.  Well, let's backtrack then.
11       My understanding of the Walgreens incident was that the
12  owners arrived and parked.  Is that part correct?
13  A    Correct.
14  Q    And then Julio Davila was around, but was not at the
15  Walgreens, correct?
16  A    He went around the pharmacy twice in his truck.
17  Q    And when you say "around the pharmacy," are you talking
18  within the parking lot of the pharmacy or around the block?
19  A    No, inside the pharmacy.
20  Q    What was Julio Davila driving?
21  A    A truck.
22  Q    And so, is this also the incident where Charlie also
23  drives around the parking lot?
24  A    Exactly.
25  Q    Because earlier you testified that Charlie was taking a
```

1   long time to get there and that the police unit showed up.

2   A    No.  Charlie was already there.  The one that did not

3   arrive was the patrol car.

4   Q    But I asked you earlier, isn't it true that Aida Palacios

5   arrived to the Walgreens followed by the Edinburg PD unit and

6   you testified that was accurate.

7          MR. STURGIS:  Judge, I think he was mistaken in his

8   testimony.

9          THE COURT:  Well, just ask him to clarify.

10          MS. GUTIERREZ:  Okay.

11          THE COURT:  I mean, he can clarify.

12  BY MS. GUTIERREZ:

13  Q    Can you clarify please?

14  A    It's just that you're getting me confused.

15  Q    I'm confused too, so let's un-confuse each other.

16       Can you explain to me then, how is it that the Edinburg PD

17  patrol until arrived at the Walgreens parking lot?

18  A    Charlie called it and the patrol car took some time in

19  getting there.

20  Q    Okay.  Did it finally arrive?

21  A    It did arrive and the officer got out and I saw him.

22  Q    What did the officer do?

23  A    The officer got out of his patrol car and went directly to

24  the car but the car was empty.

25  Q    So the patrol unit arrived after the two individuals had

60

1   already exited their car and walked somewhere towards the store

2   or somewhere?

3   A    Exactly.

4   Q    And this -- and, at the time that Julio Davila circled the

5   Walgreens store within the parking lot, were the individuals in

6   their vehicle; had they gotten out yet?

7   A    They had not gotten out of the car yet.  But my son told

8   me that they had called him and told him that things looked

9   suspicious there and that my son told them, I'll be right

10  there, I'll be right there.  And so that's why we think they

11  got out.

12  Q    But you were observing from across the street.  You were

13  able to see if these individuals actually got out of that

14  vehicle?

15  A    What happened is that that operation lasted about 20

16  minutes, so it was a long time.  So I never saw them exactly

17  when they were getting out of the car or where they went.

18  Q    So in order to scare these individuals, no one had to come

19  up to them and be aggressive with them or threaten them,

20  correct?

21  A    Correct.

22  Q    It was just the presence of a vehicle that caused them to

23  draw conclusions and leave, correct?

24  A    They left, yes, correct.

25  Q    And how was this enough to get these individuals off

1    Junior's back?

2    A    What happened is that they realized when they left -- I

3    don't know exactly what was discussed amongst them later on,

4    but I know that nothing was resolved, because the patrol car

5    showed up a lot later.  And so I really don't know about that

6    matter, and it ended, but this is all I can tell you.

7    Q    But Junior didn't come to you anytime thereafter and tell

8    you these individuals are still bothering me, dad?

9    A    Look, no, I don't recall what it is that he told me, but

10   he never showed up, my son.  I told him what had happened and

11   he told me he had talked to those people.

12   Q    But, again, he never came to you and told you that he had

13   problems with those same individuals, correct; yes or no?

14   A    I believe that later on he told me something about it.

15   Nothing happened at the time, but then later on -- I believe

16   I'm starting to remember that he came back to tell me that the

17   people kept bothering him.

18   Q    But at that time, later on, when Junior mentioned that,

19   you didn't engage in creating this elaborate appearance of law

20   enforcement force to scare them away?

21   A    I don't recall.  I don't remember what exactly -- we did

22   not hire Charlie again for that incident.

23   Q    And the incident that occurred at Junior's grocery store,

24   that was different individuals, right; different owners of

25   drugs, correct?

1    A    Exactly.

2         THE COURT:  All right.   Why don't we take our noon

3    recess at this time since it is noon.

4         Again, I'll just remind you, please don't discuss the

5    case with anyone and keep your juror badges on at all times

6    when you're in the building.  If you could take your notes with

7    you and leave them in the jury room.  We're going to start at

8    1:30 p.m., so if everybody could be back by 1:30 p.m.  All

9    right.  Jury is excused.

10        THE CLERK:  All rise for the jury.

11        **(Jurors exit courtroom at 12:01 p.m.)**

12        THE COURT:  Yes, everyone is excused.  And I do have

13   a number of cases I'm going to hear during the noon hour, but

14   they can work around you.

15        **(Recess taken from 12:01 to 1:34 p.m.)**

16        **(Portion omitted from 1:34 to 1:39 p.m.)**

17        **(Jurors enter courtroom at 1:39 p.m.)**

18        THE COURT:  Good afternoon, again.  Please be seated.

19   All right.  Ms. Gutierrez was still examining Mr. Guerra, Sr.

20   and so I'll just ask her to pick up where she left off.

21   Anytime you're ready.

22        MS. GUTIERREZ:  Thank you.

23   //

24   //

25   //

**CROSS EXAMINATION (CONTINUED)**

1

2  BY MS. GUTIERREZ:

3  Q    Mr. Guerra, just one quick question going back to the time

4  that $130,000 was stolen from a bone-colored Cadillac.  Isn't

5  it correct that you -- one of the persons in the vehicle with

6  you was named Rosio; a male named Rosio?

7  A    No woman was riding with me.  There was a man riding with

8  me.

9  Q    And the male that was riding with you was named Rosio?

10 Not a female; a male named Rosio?

11 A    His name is Carlos.  I know him by Carlos.

12 Q    Okay.  But you didn't tell any agents that there was a

13 Rosio with you at that time, correct?

14 A    I did not tell them any of that.  No woman was with me.

15 Q    Well, I'm talking about a male named Rosio.  You didn't

16 tell agents that there was a male named Rosio with you on that

17 occasion?

18 A    I don't recall.  I do remember about a person whose name

19 is Carlos.

20 Q    Okay.  You told agents that you used Julio Davila and Aida

21 Palacios at least 10 times for them to store marijuana and

22 cocaine for you, correct?

23 A    Correct.

24 Q    And you also testified that they would pick up the drugs

25 from you at your place of business, correct?

64

1    A    They went to the shop on one occasion to pick up cocaine.

2    Q    So your business was, in fact, used in your drug

3    trafficking activities, correct?

4    A    The shop.

5    Q    And your -- is there a distinction between the shop and

6    trucking company?

7    A    Of course, yes.

8    Q    And what is that distinction?

9    A    The shop is a shop and the transportation is something

10   entirely different.

11   Q    And is that on the same property?

12   A    No.  The shop has been seized.

13   Q    So it was two separate properties is what you're telling

14   us?

15   A    Yes.

16        **(Pause)**

17   Q    How much would you pay Julio Davila and Aida Palacios to

18   store drugs for you?

19   A    I don't recall exactly.

20   Q    But you did pay them, correct?

21   A    Yes.

22   Q    And isn't it true that at different times, or on some

23   occasions, you actually took the cocaine to their house?

24   A    In one or two occasions.

25   Q    And can you tell the jury who else was present during

65

1    those occasions when you took cocaine over to Julio Davila and

2    Aida Palacios' residence?

3    A    Mr. Davila and Aida Palacios.

4    Q    Isn't it true that you told the agents that there were

5    other individuals present who witnessed you taking the drugs

6    there?

7    A    On one occasion.

8    Q    And who were those other people?

9    A    On one occasion, I picked up those 15k's that you are

10   mentioning.  I went to pick them up and then supposedly there

11   were 15, but there were two missing, so I only ended up picking

12   up 13.

13   Q    Okay.  And we'll get there, but what I'm talking about

14   right now is when you delivered those 15 kilos of cocaine.

15   A    Okay.

16   Q    And I'm asking you to tell the jury who was present at the

17   time.

18   A    It was Ms. Palacios.  Davila was there and also an aunt of

19   Palacios.

20   Q    And they all observed you delivering the 15 kilos of

21   cocaine, correct?

22   A    Correct.

23   Q    And do you know the name of Aida Palacios' aunt?

24   A    Yes, it was -- she was a judge.  I'm sorry.  It was when I

25   went to pick up the kilos that the aunt was present, not when I

66

```
 1   went to deliver them.
 2   Q    And isn't it true that that aunt -- you testified that she
 3   was a judge, correct?
 4   A    Yes.
 5   Q    And are we talking about Mary Alice Palacios?
 6   A    Yes.
 7   Q    And you're saying that it wasn't at the time that you
 8   delivered the 15 kilograms of cocaine, but it was when you went
 9   to recover them; is that right?
10   A    Exactly.
11   Q    And all three individuals observed you picking up the
12   cocaine, correct?
13   A    Yes.
14   Q    And how much did you pay Julio Davila and Aida Palacios at
15   that time for having stored the cocaine?
16   A    I did not pay him anything.
17   Q    And the reason you didn't pay him is because you were
18   missing two kilos of cocaine; is that right?
19   A    Correct.
20   Q    So then you took it as those two kilograms of cocaine were
21   the payment; is that right?
22   A    I did not interpret it that way, or as if he lost them.
23   Q    Okay.  So then you didn't pay him anything because of the
24   fact that he lost some of your cocaine, correct?
25   A    Correct, because you cannot lose something inside your
```

67

1    house.

2    Q    So you believed that he took your cocaine, correct?

3    A    Sure.

4    Q    How much is a kilogram of cocaine worth?

5    A    I don't know.  Back then, it was $16,000-$17,000.

6    Q    So if we went with the $16,000 figure, you had a loss of

7    about $32,000; is that right?

8    A    Correct.

9    Q    Now, you did your own drug dealings independent of Julio

10   Davila and independent of J.P. Flores and the Panama Unit;

11   isn't that correct?

12   A    Very rarely, because I would always hire Mr. Flores.

13   Q    Isn't it true that you told agents that sometime in early

14   2012 there was an individual by the name of El Ronco, who was a

15   waiter at Ponchos, who introduced you to another individual who

16   wanted you to transport 1,500 pounds of marijuana?

17   A    Correct.

18   Q    And that deal had nothing to do with J.P. Flores or Julio

19   Davila, correct?

20   A    Correct.

21   Q    And in that deal, you coordinated a fabricated seizure by

22   law enforcement so you wouldn't have to pay transport or pay

23   for the marijuana, correct?

24   A    Correct.

25   Q    And this fake seizure by law enforcement required actual

68

```
 1   law enforcement individuals so that it appeared that the drugs
 2   were seized, correct?
 3   A    Correct.
 4   Q    And, again, this was not something that was done by using
 5   J.P. Flores, correct?
 6   A    No.  I did it with J.P. Flores.  He prepared the report.
 7   Q    Okay.  Well, okay.  Explain to me if the law enforcement
 8   individuals that were used on this occasion were provided to
 9   you by J.P. Flores.
10   A    I think he prepared the report that I handed over and I
11   think I used -- when I talked to that man, I think I mentioned
12   I used Panama.
13   Q    When you talked to "that man," are you talking about the
14   agent that you talked to?
15   A    I did not understand.
16   Q    You said that when you spoke to "that man" and you
17   mentioned something about Panama in there with respect to your
18   deal.  So, I'm not understanding you.
19   A    Okay.  I handed him over a report prepared by J.P.  This
20   man, he kept talking to me so I commented this to J.P. that
21   this person was putting some pressure on me, so he told this to
22   Compañero.  So the thing didn't go much further.  They stopped
23   bothering me, but we didn't have to do a stop or anything.
24   Q    And by "Compañero" you mean that J.P. Flores spoke to
25   Fabian Rodriguez, correct?
```

1   A     Correct.

2   Q     So then, what you're saying through your testimony to the

3   jury is that on this occasion when you stole 1,500 pounds of

4   marijuana from the individual who El Ronco had connected you

5   with, the only thing that J.P. did was provide you with a

6   report; is that correct?

7   A     Correct.

8         **(Pause)**

9   Q     Isn't it true that you told agents that you had Julio

10  Davila and Aida Palacios store a total of 25 kilograms of

11  cocaine at their residence?

12  A     It must have been.  I do not recall exactly, but they did

13  store it for me on a few occasions.

14  Q     And when you add up all those occasions, it added up to

15  about 25 kilograms of cocaine, correct?

16  A     Yes, correct.

17  Q     And you also told agents that Davila and Palacios also

18  stored about 1,500 pounds of marijuana total, correct?

19  A     I do not recall exactly the amount.

20  Q     But they did store marijuana for you, correct?

21  A     Yes.

22  Q     Now, the first time that you worked with the Panama Unit

23  was on an incident that the Panama Unit stole one kilogram of

24  methamphetamine for you, correct?

25  A     I couldn't define that for you because we never worked

1   with meth.  On one occasion, they brought me meth and I refused

2   it; gave it back.

3   Q    Are you saying that that came from the Panama Unit without

4   you having anything to do with the seizure or the theft of the

5   methamphetamine?

6   A    It's just that, honestly, really, I do not remember; I'm

7   telling you.

8   Q    Isn't it true that you told agents that the information on

9   the methamphetamine came to you through someone else, who told

10  you that there was that one kilogram of meth at a home north of

11  Weslaco, Texas?

12  A    Oh, yes, correct.  I'm sorry.  Yes.

13  Q    And then you and another individual and Fabian Rodriguez

14  travelled to Weslaco, Texas and that individual showed you the

15  residence, correct?

16  A    Correct.

17  Q    And then, at that point, Fabian Rodriguez called Jonathan

18  Treviño, who then dispatched the Panama Unit to that residence,

19  correct?

20  A    Correct.

21  Q    And the Panama Unit stole the methamphetamine and brought

22  it to you, correct?

23  A    Correct.

24  Q    And that is the methamphetamine that was of bad quality

25  and you refused to purchase it, correct?

1    A    Correct.

2    Q    And let me ask you how that works, because if you are the

3    individual who sent them to steal it, how is it that you can

4    refuse to pay for it?

5    A    Because he also had another outlet somewhere else.

6    Q    And what you mean by "outlet" is someone else; another

7    place he could sell it?

8    A    Exactly.

9    Q    And so then, at that point, how was the payment left as

10   far as do you owe the Panama Unit money for going out there or

11   do they owe you something for the tip?

12   A    They owed me something, but I couldn't do anything with it

13   so they took it elsewhere and paid me some money for it.

14   Q    Did they owe you something?  Did they owe you money prior

15   to this incident or did they owe you money for this incident?

16   A    That was once they sold that stuff.  That's when they paid

17   me.  But I don't think they owed me money prior to that.

18   Q    And prior to you contacting Fabian Rodriguez, you had to

19   go through J.P. Flores in order to get permission to speak with

20   Fabian Rodriguez, correct?

21   A    Correct.

22   Q    Isn't it true that on that occasion with the

23   methamphetamine Jonathan Treviño was insisting that you still

24   pay $10,000, correct?

25   A    Correct.

1  Q    And why is it that he was demanding that you pay $10,000?

2  A    Because he wanted -- he needed money, but I did not have a

3  way to sell that.

4  Q    And J.P. Flores was also the individual that was the

5  contact person between you and either Joe Padilla at Hidalgo

6  County Sheriff's Office or Sherriff Lupe Treviño, correct?

7  A    No, with J.P. Flores.

8  Q    And I understand that.  But J.P. Flores was the contact

9  person that stood between yourself and Joe Padilla and the

10 Sherriff, correct?

11 A    Correct.

12 Q    And you told agents that on one occasion Flores asked you

13 for money on behalf of Padilla for support of the Sherriff,

14 Treviño, correct?

15 A    Correct.

16 Q    And at various times you gave different amounts, ranging

17 from $1,000 to $5,000 in U.S. currency; is that correct?

18 A    It was $1,000, $3,000, $4,000.  It was never extreme

19 amounts of money.

20 Q    Isn't it true, though, that when you gave money for the

21 boat for Sherriff Treviño, you gave -- between you and your

22 son, you-all gave about $15,000; isn't that right?

23 A    I don't recall the exact amount of money, but it was

24 provided by three persons.  I don't recall the amount, but it

25 was rather high; extreme.

1   Q    Okay.  And by "extreme," you're saying it was a

2   substantial amount of money, correct?

3   A    Some $10,000 I think, but I don't recall exactly the

4   amount, but it was not $15,000.

5   Q    Okay.  Well, you would agree with me that, because of

6   these schemes when you were stealing marijuana and cocaine and

7   selling it, there was large amounts of money going through your

8   hands; isn't that correct?

9   A    It was not too large.  They were not too large, the

10  amounts, because there were several people involved, so we

11  would get to keep about a third.

12  Q    Okay.  Well, let me ask you about the 1,500 pounds of

13  marijuana that you stole from the man who El Ronco connected

14  you with.  How much money did you sell 1,500 pounds of

15  marijuana for?

16  A    A hundred dollars.

17  Q    Total?

18  A    It's 1,500.  It's $150,000.

19  Q    Is that the average price of a kilogram [sic] of

20  marijuana; $100 for a pound?

21  A    Correct.

22  Q    So out in the streets, a pound of marijuana costs $100?

23  A    No, no.  But when you work this way, it's a very fast way

24  of selling everything in order for you to pay the people that

25  are working with you.

74

1   Q    What is the going rate for a pound of marijuana on the

2   street?

3   A    I don't know right now exactly.

4   Q    Well, what about at that time?

5   A    $130; it all depends on the quality of the material and

6   how much it cost.

7   Q    So wouldn't you agree, though, that $150,000 is a large

8   amount of money?

9   A    Yes.

10  Q    And even though that was split, it's still an amount of

11  money that went through your hands, correct?

12  A    Correct.

13  Q    Because you're the person who sold the marijuana and

14  that's why you're the person who received payment?

15  A    Correct.

16  Q    And at other times, you would make deals with similar

17  amounts of -- well, similar quantities of drugs; is that

18  correct?

19  A    Very rarely.  Those quantities were very rare.

20  Q    Well, right, but when we're dealing with 15 kilograms of

21  cocaine, even though the quantity of the drug is smaller, the

22  value is larger; isn't that correct?

23  A    Kilos of cocaine or marijuana?

24  Q    Remember we talked about 15 kilograms of cocaine that were

25  stored at Davila's and Palacios' house, right?

75

1    A    Yes, but you're asking about marijuana and then you ask me

2    about cocaine?

3    Q    Right.  I am asking you about cocaine, because that's also

4    something you stole; isn't that correct?

5    A    Correct.  There were people that -- well, some people will

6    do certain things but those were from the people that were

7    introduced, but it was all through me.

8    Q    And what I'm talking about is the money that passed

9    through your hands as a result of selling either marijuana or

10   cocaine.

11   A    Correct.

12   Q    And so what I'm asking you is that, with respect to that

13   incident with the cocaine at Davila and Palacios' home, you

14   said you retrieved 15 -- you delivered 15 kilograms of cocaine

15   but retrieved two kilograms less, which is 13 kilograms; is

16   that correct?

17   A    Correct.

18   Q    And while 13 kilograms of cocaine is much less than 1,500

19   pounds of marijuana, it could still be valued possibly more

20   than the marijuana; isn't that correct?

21   A    Maybe so.

22   Q    Okay.  Can you tell me how much you made on the 15 [sic]

23   kilograms of cocaine?

24   A    I made just one-third.  All the rest has to be split.

25   Q    And I understand that, Mr. Guerra.  But I want you to tell

76

1    the jury how much were the 13 kilograms of cocaine sold for.

2    A    I couldn't give you an exact price.  $15,000.

3    Q    And that's $15,000 per kilogram?

4    A    Correct.

5    Q    So that would be about -- close to $200,000, correct?

6    A    I don't know exactly.

7         **THE COURT:**  $225,000.

8         **MS. GUTIERREZ:**  $225,000?

9         **(Pause)**

10        **THE COURT:**  Fifteen?  That was 15?  Sorry.

11        **MS. GUTIERREZ:**  Fifteen and 13.

12        **THE COURT:**  Oh, I'm sorry.

13        **MS. GUTIERREZ:**  Fifteen and 10 would be $150,000, and

14   then $45,000, so $195,000.

15        **THE COURT:**  $195,000.

16   **BY MS. GUTIERREZ:**

17   Q    Would you agree with me that 13 kilograms of cocaine at

18   $15,000 a kilogram would be about $195,000?

19   A    I would need to -- if you say that's what it is then

20   that's what it is.

21   Q    And so, just on two occasions, we're talking about close

22   to half a million dollars?

23   A    Correct.

24   Q    And that's all money you handled, correct?

25   A    But it's not half a million dollars.  It's $300,000.

77

1   Q    Well, I'm saying that it's close to half a million dollars

2   on just two occasions.

3            **THE COURT:**  Is that a question?

4            **MS. GUTIERREZ:**  Yeah.  Isn't that correct?

5            **THE COURT:**  Asked and answered.  He said it's about

6   $300,000.

7            **MS. GUTIERREZ:**  Okay.

8   **BY MS. GUTIERREZ:**

9   Q    And that money all passed through your hands.  Even though

10  you didn't keep it all, it did go through your hands, correct?

11  A    Correct.

12  Q    And you're the person that would divide it and deliver it

13  to the individuals who needed to paid, correct?

14  A    When the job was mine I would be the person responsible

15  for paying off, but when it was somebody else's job he would

16  have to pay me, but I would store the material.

17  Q    On the instances where you utilized the Panama Unit in

18  order to steal drugs for you, did you have to pay -- did the

19  payment to the Panama Unit go through J.P. Flores?

20  A    Everything.

21  Q    So, phone calls and money payments, all that information -

22  - all that information and the money went through J.P. Flores?

23  A    Of course, yes.

24  Q    And what was J.P. Flores' share in those deals?

25  A    The same as I made.

1  Q    So pretty much at this point J.P. Flores and you are equal

2  partners; is that correct?

3  A    Sure.

4  Q    And so, when the Panama Unit would use -- when you would

5  use the Panama Unit, was the Panama Unit also an equal partner

6  in this that would get a third?

7  A    They would work -- whenever they work on their job, they

8  would pay us and they paid J.P., el Compañero, and myself and

9  we would split it evenly; the rest was theirs.

10  Q    Are we talking about jobs that the Panama Unit did

11  independent of any of your tips?

12  A    Yes.

13  Q    Okay.  So when the Panama Unit had their own deals that

14  they would go -- where they would go out and steal drugs, they

15  would bring those drugs back to you -- to sell them to you; is

16  that right?

17  A    Correct.

18  Q    And if you chose to purchase those drugs, who -- I imagine

19  the Panama Unit would be paid for the drugs; is that correct?

20  A    Could you repeat the question?

21        THE COURT:  Well, I'm confused.  Did you purchase

22  drugs from the Panama Unit or were they just consigned to you

23  and you would sell them for the Panama Unit?

24        THE WITNESS:  Correct.  They would bring them to me

25  so that I, in turn, could sell them.

1          **MS. GUTIERREZ:**  Okay.

2     **BY MS. GUTIERREZ:**

3     Q    And we're talking here about drugs that you had no

4     involvement in leading them to; is that correct?

5     A    Correct.  That was their independent work.

6     Q    Okay.  So then with the Panama Unit you served in two

7     capacities.  On the one hand, you gave them information as to

8     where there were drugs that they could steal for you, and on

9     the --

10    A    That was very rare.  It was two or three occasions only.

11    Q    And the other way that you worked with the Panama Unit was

12    as, basically, the seller of the drugs that they would steal?

13    A    Sure.

14    Q    And when you led them to a tip, to a home or a location

15    where there were drugs that they stole for you, in that case

16    did you pay the Panama Unit for their services or did you share

17    in the proceeds of the drugs that they stole?

18    A    Well, it was half.  But if there were three people

19    involved it would be one-third, which would go to the person

20    that had given me the tip, the other third for the unit, the

21    Panama Unit, and another third for Compañero [sic].

22          **THE COURT:**  And I.

23          **THE INTERPRETER:**  And I.

24    Q    So, in your dealings with the Panama Unit, you and

25    J.P. Flores were basically together on all of these deals?

1   A    Yes.

2   Q    And you would share this -- you would -- the percentage

3   that went to you would basically be going to you and

4   J.P. Flores?

5   A    Correct.

6   Q    And then was that split evenly between you and

7   J.P. Flores?

8   A    Sure, yes.

9        **(Pause)**

10  Q    Now, going back to -- you testified already that you

11  would, through J.P. Flores, give money, donations,

12  contributions, in the amount of $2,000-$3,000, correct?

13  A    Correct.

14  Q    And that money was to go to either Davila or the Sherriff,

15  correct?

16  A    Correct.

17  Q    And isn't it true that you told agents that you gave that

18  money with the understanding that you had protection from the

19  Hidalgo County Sheriff's Office?

20  A    It was really so that they would tip me off if something

21  was going on in my area because, even though I had Panama,

22  there was a -- a person could find out that something was going

23  on and then tell J.P. and J.P. would tell me.

24  Q    And when you say that you "had Panama," you basically had

25  the use of Panama for not only stealing drugs but protection;

81

1    isn't that correct?

2    A    Well, yes, it was also for that.

3    Q    And who was in charge of the Panama Unit as far as you

4    understood?

5    A    Jonathan.

6    Q    Well, right, but that's -- Panama Unit --

7              THE COURT:   That needs to be -- well, I guess it

8    doesn't need to be translated.  All right.

9    Q    The Panama Unit, itself, had to report to someone above

10   them.  To your understanding, who was that someone?

11   A    No, I really don't have any understanding about that.

12   Compañero would report to Fabian.  Fabian would report to

13   Jonathan.  And I don't know who Jonathan reported to.

14   Q    So is it your understanding that Jonathan Treviño was the

15   head of the Panama Unit?

16   A    Correct.

17   Q    Did you think that J.P. Flores was somehow in charge of

18   Panama Unit?

19   A    No, he had nothing to do with Panama.

20   Q    But as far as your dealings, he was the contact person for

21   Panama Unit, correct?

22   A    He was the contact for el Compañero, Fabian.

23   Q    And, as a matter of fact, you had -- you were able to

24   contact Joe Padilla through J.P. Flores; isn't that correct?

25   A    I never got to speak with him.  He would always convey an

1    offer that whatever I needed, they were in good disposition to

2    do it, but I never directly spoke to him.

3    Q    And when you say "he" when you just testified right now,

4    were you talking about Joe Padilla who would be the one that

5    would offer you their services, whatever you needed, they were

6    able and willing to do for you, correct?

7    A    Correct.

8    Q    And the communication, even thought you didn't directly

9    communicate with Joe Padilla, you did communicate to Padilla

10   through J.P. Flores, correct?

11   A    Well, I never spoke with Padilla myself.

12   Q    And I understand that.  What I'm asking you is if you're

13   telling the jury that your communication to Padilla only

14   occurred through J.P. Flores?

15   A    Yes.  He would always offer his services but, really, what

16   he would always do is just provide information as for if

17   something out of the ordinary was going on in my area.

18   Q    At some point, Joe Padilla gave you information that law

19   enforcement was looking into you and your business; isn't that

20   correct?

21   A    Correct.

22   Q    And by law enforcement, it was FBI; isn't that correct?

23   A    Correct.

24   Q    And you paid Padilla for that information through

25   J.P. Flores, correct?

83

1    A    Yes.

2         **(Pause)**

3    Q    Isn't it true that you provided the Panama Unit with an

4    address of 3813 Teal in McAllen, Texas for them to raid?

5              **THE INTERPRETER:**  What was it?  I'm sorry.

6              **MS. GUTIERREZ:**  3813 Teal.

7    A    I did not understand.

8    Q    Do you recall an incident that occurred on July 13, 2012,

9    where you provided an address in McAllen, Texas to the Panama

10   Unit where the McAllen PD arrived at the location prior to

11   Panama stealing the drugs?

12   A    Correct.

13   Q    And so, in that incident, you were the one that provided

14   them with the location for them to raid?

15   A    No.  I was given that information and I gave it to

16   Compañero.  And before they could move in, the McAllen police

17   arrived.  And then Jonathan arrived and they asked him what was

18   he doing there, and he said that they had a call to go check.

19   Q    And when you say "Compañero," are you talking about

20   J.P. Flores or Fabian Rodriguez?

21   A    Before calling anybody else, I would have to call J.P.

22   J.P. would call Compañero.  And on that occasion, we went with

23   Compañero in a truck with a person, my friend that had given

24   the information, and we went to the place.  But before they

25   could move in the police had arrived.

84

1   Q    Are you telling the jury that, in this incident, it was

2   you, J.P. Flores, Fabian Rodriguez, and the individual that

3   gave you the tip that were all in one vehicle that drove out to

4   the location?

5   A    J.P. was not with us.  He just put me in contact with

6   Compañero.

7   Q    But isn't it true that you had Fabian Rodriguez's contact

8   information?

9   A    Yes, correct.

10  Q    And so you could have contacted Fabian Rodriguez directly

11  couldn't you?

12  A    Cannot do that because you always have respect.

13  Q    So it was like a protocol that you had to follow?

14  A    Correct.

15  Q    So you would respect protocol but you wouldn't respect

16  other people's drugs that you stole?

17       THE COURT:  That's argumentative.  Next question.

18  Q    Did J.P. Flores, in that incident, give you the okay to

19  ride with Fabian Rodriguez to the location?

20  A    Yes.  I asked him for permission to contact him.  I could

21  not talk to him directly.

22  Q    So if J.P. Flores had told you no, you would not have --

23  A    We would not work.

24  Q    So was J.P. your boss to a certain extent?

25  A    I couldn't make the decision like let's do this.  I had to

85

1    consult with him.  If he gave the go ahead, we would go ahead.

2    If not, we will just drop it.

3    Q    Well let me ask you, what would you do with a tip if

4    J.P. Flores would say no, don't contact -- you can't contact

5    Fabian Rodriguez?

6    A    Everything would be cancelled.

7    Q    And so you wouldn't even attempt to get the drugs that

8    were at that location?

9    A    No.  There would be no personnel to do that.

10   Q    So then a tip in your hands was really -- amounted really

11   to nothing because you didn't have the resources to get

12   somebody to those locations to do the stealing, correct?

13   A    Correct.

14   Q    And the person that had those resources was J.P. Flores;

15   is that right?

16   A    Correct.

17   Q    And that's why you partnered up with J.P. Flores, correct?

18   A    Correct.

19   Q    And prior to that, Julio Davila was the one that provided

20   the resources to you to be able to steal drugs; is that

21   correct?

22   A    Correct.

23        **(Pause)**

24        **THE COURT:**  All right.  We're going to switch to the

25   team method of interpreting.  This will take a moment.  One of

```
 1   the interpreters will interpret the question; the other will
 2   interpret the response.
 3          (Pause)
 4             THE COURT:  All right.  We're ready.
 5             MS. GUTIERREZ:  Okay.
 6   BY MS. GUTIERREZ:
 7   Q    Mr. Guerra, you've already testified that your
 8   relationship with J.P. Flores initially began by J.P. Flores
 9   running plates, correct?
10   A    Yes, correct.
11   Q    At what point did J.P. transition from just running plates
12   for you to a full-on drug trafficker partner?
13   A    Well, when we were checking plates and data, we talked and
14   he said he -- that was when we talked to a friend.  He said he
15   had a friend who was trusted and who would do a simulation run.
16   Q    But with the Panama Unit, you didn't really simulate
17   anything.  You just -- you went actually onto properties and
18   searched properties and stole drugs, correct?
19   A    Yes.  But we had, on the side, the friend and they didn't
20   know that we worked with him.
21   Q    Okay.  And we'll talk about that in a little bit.  Right
22   now I'm focused on the Panama Unit and your relationship with
23   J.P. Flores.
24   A    Correct.
25   Q    Okay.  Because it sounds to me like when you were doing
```

1    these deals through J.P. Flores -- I'm sorry, with -- through

2    J.P. Flores with the Panama Unit, J.P. Flores was now in a

3    different capacity than just running plates for you.  Is that

4    accurate?

5    A    The plates worked to a certain extent.  But, independently

6    of that, we also had the friend; his friend, who we had in

7    addition.  He was Mr. Garza.

8    Q    And, again, Mr. Guerra, I understand what you're saying

9    and we're going to get to that in a little bit.  Right now I'm

10   talking about J.P. Flores and how he transitioned from just

11   assisting you by selling you information on registration runs,

12   or checks, to eventually becoming a full-on drug dealer equal

13   with you.

14   A    When we talked -- I understood your question now.  When we

15   talked, he told me -- and it was what you're saying we'll talk

16   about later.  He said, well, I have this friend and we can do

17   these fake scenario simulation runs.

18   Q    Okay.  We're going to do this the long way.

19        At what point did you first utilize the Panama Unit in

20   your drug trafficking schemes?

21   A    Well, I'm repeating myself.  This started with J.P.'s

22   Compañero.

23             THE COURT:  Are you looking for a date or a sequence?

24             MS. GUTIERREZ:  Well, basically your Honor --

25             THE COURT:  You can maybe clarify.

1        **MS. GUTIERREZ:**  I want to know how long before he --

2   initially, it sounds to me like he wasn't trafficking the drugs

3   -- J.P. Flores -- and then at some point he was trafficking

4   drugs.  And so I want to know the period of time, the span of

5   time, from when he started to when he wasn't trafficking drugs

6   and only assisting in the registration checks to where he was

7   receiving an equal percentage as Mr. Guerra, because at that

8   point, I believe, is when he was a drug trafficker.

9        **THE COURT:**  All right.  So we've talked about these

10  dates already:  Mid-2009, end of 2009 forward from there.  So

11  proceed with your questioning.  Let's not try to retread ground

12  that we already have answers to.

13  **BY MS. GUTIERREZ:**

14  Q    These simulated traffic stops, were they occurring during

15  the same period of time that you were utilizing the Panama

16  Unit?

17  A    Yes.

18  Q    So is it fair to say that pretty much from the time that

19  you and J.P. Flores began directly -- began your direct

20  relationship, where you had cut out Julio Davila, that he

21  started drug trafficking with you?

22  A    Yes.

23  Q    Is it during that -- from the very beginning of your and

24  J.P. Flores' direct relationship, you were using the Panama

25  Unit; is that correct?

1    A    Repeat the question for me, please.  I am confused.

2    Q    From the onset of your direct relationship with

3    J.P. Flores, you began using the Panama Unit in your schemes;

4    is that correct?

5        **(Witness answers in Spanish)**

6            **MS. GUTIERREZ:**  Okay.  Isn't --

7            **THE COURT:**  Hang on.

8            **THE WITNESS:**  Correct, but --

9            **MS. GUTIERREZ:**  I'm sorry.

10           **THE WITNESS:**  Correct, but Panama wasn't -- how do I

11   say it?  It was for a certain time.  It was later, and we

12   couldn't agree with the Compañero, with Jonathan [sic].

13           **THE COURT:**  Hmm?

14           **MS. GUTIERREZ:**  That's not --

15           **THE COURT:**  That wasn't the translation.

16           **THE WITNESS:**  I don't know how to explain it, but we

17   couldn't go further down because Jonathan basically wanted more

18   money.  We couldn't agree.

19       **(Pause)**

20           **THE COURT:**  Do you want to re-ask that question or --

21   I'm not sure we got the answer that was responsive to the

22   question.

23           **MS. GUTIERREZ:**  I'll ask it.  I'll re-ask it, your

24   Honor.

25           **THE COURT:**  All right.

1          **THE WITNESS:**  Okay.

2    **BY MS. GUTIERREZ:**

3    Q    Is it correct that, from the onset of your direct

4    relationship with J.P. Flores, you were utilizing the Panama

5    Unit in your schemes?

6    A    Okay, the Panama Unit.  I would speak with J.P. and J.P.

7    would speak with Compañero and that's how we would use Panama.

8    Q    But you using the Panama Unit started right when you began

9    your direct relationship with J.P. Flores; is that correct?

10   A    Yes, correct.

11   Q    So J.P. Flores provided you with various ways of being

12   able to accomplish your schemes of stealing drugs; is that

13   correct?

14   A    Correct.

15   Q    And, even during that time, you also had the ability to

16   use the Julio Davila conspiracy at times that you chose to; is

17   that correct?

18   A    No, not anymore; not with him.

19   Q    But you did testify yesterday that there was a period of

20   time that you -- that it overlapped, your use of Julio Davila's

21   conspiracy at the same time that you were using J.P. Flores'

22   conspiracy, correct?

23   A    Correct.  Yes, we checked -- with J.P. we checked license

24   plates and then I would talk directly to Davila.  But then, in

25   that case, J.P. would not get a share.

```
1   Q    Isn't it true that you told agents that you tipped off the

2   Panama Unit to locations where there were drugs approximately

3   20 times?

4   A    I don't know exactly -- do not recall exactly, but there

5   were several times.

6   Q    So it could have been 20 times, correct?

7   A    Maybe less.  I do not recall exactly.

8   Q    And isn't it true that you told agents that, of those

9   times that you provided no tip to the Panama Unit, they came to

10  sell you drugs they had stolen approximately 30 times; isn't

11  that correct?

12           MR. STURGIS:  I'm going to object.  This was asked

13  and answered.

14           THE COURT:  Right.  We've been through this.

15           MR. STURGIS:  We have been over this many, many

16  times.

17           MS. GUTIERREZ:  Your Honor, I'm trying to establish

18  the --

19           THE COURT:  We've been through that exact question

20  previously.

21           MS. GUTIERREZ:  About the times that he used the

22  Panama Unit independent?

23           MR. STURGIS:  Yes, many times.

24           THE COURT:  Absolutely.  That's what he said; about

25  30.  You asked him straight from the report.
```

92

1        **(Pause)**

2    **BY MS. GUTIERREZ:**

3    Q    After the Panama Unit was arrested, you continued with

4    your drug trafficking activities, correct?

5    A    With Compañero.

6    Q    And by "Compañero" you're talking about J.P. Flores,

7    correct?

8    A    Yes, correct.

9        **(Pause)**

10   Q    You also provided the Panama Unit with a home -- with the

11   directions to a home located on La Homa Road, where there were

12   drugs stored; is that correct?

13   A    In La Homa; a trailer home?

14   Q    Yes, in Mission, Texas?

15   A    Mission, yes.

16   Q    And the Panama Unit went out there; isn't that correct?

17   A    Yes, and there was nothing.

18   Q    But in that incident, apparently, the Panama Unit did not

19   get consent to search the property and they searched it anyway,

20   correct?

21   A    Yes, correct.  There was a fence in the structure and so

22   they did not get consent and he still went in anyway, so they

23   called the father, the office.

24   Q    When you say the "father," you're talking about Sherriff

25   Treviño, the father of Jonathan Treviño, correct?

93

1    A    Correct.

2         **(Pause)**

3    Q    Okay.  Now let's talk about some testimony that you gave

4    yesterday.  You stated that you, at some point, met Jorge Garza

5    at a Love's location.  Do you recall that?

6    A    Yes, North Edinburg, 2812.

7    Q    And you stated that you only greeted him but you didn't

8    talk to him, correct?

9    A    Correct.  I only greeted the man.  I never spoke with him

10   about any direct deals or anything.

11   Q    And so then, on that occasion, you simply just ran into

12   him; isn't that correct?

13   A    No, not supposedly, because Compañero had told me that he

14   and him would be there.

15   Q    So are you saying that J.P. Flores was at that location as

16   well?

17   A    Of course, yes.

18   Q    But you did not plan to meet Mr. Garza at the Love's did

19   you?

20   A    They were riding motorcycles, but Compañero called me and

21   told me they were there.  It was a coincidence.

22   Q    And so you went to meet up with J.P. Flores, correct?

23   A    Correct.

24   Q    And so Mr. Garza just happened to be there; is that right?

25   A    Yes, correct.  They were on their motorcycles.

94

1   Q    And from what you know, J.P. Flores and Mr. Garza were

2   friends; is that correct?

3   A    For many years.

4   Q    And they were also in a motorcycle club together; is that

5   correct?

6   A    Yes.

7   Q    So it wouldn't be uncommon to find them riding their

8   motorcycles together; isn't that correct?

9   A    No.  They were a group of people who always get together.

10  Q    And, as a matter of fact, that motorcycle club had a lot

11  of deputies who were part of that club, correct?

12  A    I don't know who they might be.  I just spoke with

13  Mr. Garza.  I greeted him and that was it.

14  Q    And can you tell me when that occurred, as far as what

15  year, what month?

16  A    I do not recall exactly.

17  Q    And so, when you had -- your testimony is that you only

18  greeted Mr. Garza.  But you actually had a conversation with a

19  J.P. Flores; isn't that correct?

20  A    Correct.

21  Q    And your conversation with J.P. Flores took place apart

22  from Mr. Garza; isn't that correct?

23  A    Yes, but I already knew him anyway, you know.  Whenever we

24  would do the stops, I would see him, so we already knew him.

25  But this is the first time I shook his hand.  And I also saw

1    him a couple of times later on in Edinburg.

2    Q    Okay.  So you're telling me that when you met, for the

3    first time, were able -- for the first time shook Jorge Garza's

4    hand, you had already conducted fake traffic stops; is that

5    correct?

6    A    Of course, yes.  But this was the first time I greeted him

7    and shook his hand.

8    Q    And you're not telling the jury that you coordinated

9    traffic stops with Mr. Garza, correct?

10   A    With Mr. Garza, I would always contact Compañero, and

11   Compañero would tell Mr. Garza.

12   Q    So you would never coordinate any fake traffic stops with

13   Mr. Garza; is that correct, yes or no?

14   A    He was with us.  But the one that would speak, it would be

15   Compañero would speak to him.

16   Q    Well, you're not saying he was with you in the vehicle,

17   are you?

18   A    No.  I'm sorry.  He would call him over the phone.

19   Q    So you're not -- so, in reality, he wasn't with you; isn't

20   that correct?

21   A    No, no.  It would be done over the phone.  Whenever we

22   would do a stop, a fake stop, el Garza would be waiting at the

23   Grano De Oro on Monte Cristo, just past 493.  I would be riding

24   with Compañero.  Compañero would call Amigo, the friend, and

25   they would coordinate it.

1  Q    So you were in the same vehicle with J.P. Flores; is that

2  right?

3  A    Correct.

4  Q    And you were not the one that was communicating with

5  Amigo, correct?

6  A    No.  It was J.P. on the phone.

7  Q    So this information that you're telling the jury about it

8  being Mr. Garza that was waiting at Grano De Oro is information

9  that was provided to you by J.P. Flores; isn't that correct?

10 A    We would see him.

11 Q    Okay.  And didn't these traffic stops occur at night?

12 A    Correct.  It would be late afternoon because his patrol

13 car, he could only use it from eight to five in the afternoon.

14 He could not make night stops.

15 Q    Okay.  And this information with respect to his patrol --

16 Mr. Garza's patrol unit and when he could use it or when he

17 couldn't use it or when he could stop people, that information

18 you, again, got from J.P. Flores; isn't that correct?

19 A    He never got out of his truck whenever he did the stops.

20 He would just turn on the lights of his car and then the owner

21 of the stuff would be behind and would see the lights being

22 turned on, and he would continue driving by; that's the owner,

23 the owner of that job.  And then once he had passed the

24 vehicles, Mr. Garza would just turn his lights off and

25 everybody would go their own way.

1  Q    The fact that you're stating -- or that you're telling the

2  jury that it was Mr. Garza who was in that patrol unit is based

3  on a reliance on information given to you by J.P. Flores; isn't

4  that correct?

5  A    But it's -- We would see him.  I mean, his patrol car does

6  not have dark tint and he's a tall man, so we knew who he was

7  because Compañero would be talking with Amigo and I would be

8  with Compañero, J.P. Flores.

9  Q    And, Mr. Guerra, you're not telling the jury that

10 Mr. Garza is the only tall man in Hidalgo County are you?

11 A    No.  I'm giving specifics about him, because he would

12 speak with Mr. Flores.  We would give him the description of

13 the car, the target, and he would follow it.

14 Q    You're not telling the jury that Mr. Garza is the only

15 Hidalgo County Sheriff's Office deputy who is tall are you?

16 A    No.  I'm not saying that.  There are many.  But here,

17 we're talking specifically about Mr. Garza.

18 Q    And your testimony is that you were able to see an

19 individual in the patrol unit who appeared to be tall, correct?

20 A    Well, what happens is that the car would be going and he

21 would be waiting by the side of the Grano De Oro.  Mr. Flores

22 would tell him the car is going to pass and would give him the

23 information.  He would get behind the car.  We, ourselves,

24 would get behind him so there's no way for confusion here,

25 because they were also talking on the phone.

1    Q    But you were not on that phone call; isn't that correct?

2    A    But we're inside the same vehicle and you can hear the

3    phones.

4    Q    Well, I suppose that the most you can guarantee to the

5    jury is that it wasn't a female voice on the other line, but a

6    male; isn't that correct?

7    A    It was the voice of a man.  It was Mr. Garza, because when

8    we were going to make a stop, there was this time when he was

9    waiting just by the Grano De Oro and he was told that the

10   vehicle had left, that it was going to be coming, and then it

11   was on Monte Cristo and he was waiting on the side of the

12   street.  The car passed him and then Flores told him to get

13   behind him.  He did get behind him.  He told him to follow him

14   closer.  He did.  And just when he passed 493, Flores -- when

15   the car made that stop, he immediately made -- when the car

16   made the turn, he immediately made the turn and turned his

17   patrol unit lights on.  And the owner that had been riding

18   behind them was able to see the lights going on.

19   Q    Mr. Guerra, the only thing that you can tell the jury that

20   you saw about the individual who was in the patrol unit is that

21   it was a tall individual; isn't that correct, yes or no?

22   A    But let me repeat this question.  Mr. Flores -- whenever

23   we would do that, they would keep chatting, talking, because we

24   couldn't do anything if it had not been coordinated with

25   Mr. Garza.  So the phones would never be turned off and he

99

1    never got out of his car.  He would just turn his lights on so

2    that the owner would see and leave the scene after seeing that

3    the lights were turned on, following the vehicle that

4    supposedly had the material in it.

5    Q    Mr. Guerra, you never saw Jorge Garza in the patrol unit

6    that conducted the traffic stops; isn't that correct, yes or

7    no?

8    A    Could you please repeat the question?

9    Q    You never saw Jorge Garza in the patrol unit that

10   conducted the fake traffic stops; isn't that correct, yes or

11   no?

12   A    It was -- I was there.  I was there and it was him.  I was

13   with Mr. Flores.  And after that, he would say now let's all go

14   now.

15   Q    Mr. Guerra, the jury needs to know what you actually saw

16   and that's what I'm asking you about.  And so I'll ask you

17   again.  You never saw Jorge Garza in the patrol unit that

18   conducted the fake traffic stops; isn't that correct?

19   A    He would drive his patrol car and it was the only unit and

20   it had to be used in the afternoon because he was not supposed

21   to make stops in daylight because that was not his job.  I

22   believe he worked for the courts.  But it would have to be done

23   after 5:00 p.m. and he used his patrol car.

24   Q    Mr. Guerra, I'm going to ask you a yes or no question.  Do

25   you understand that?

1    A    Yes.

2    Q    Will you agree with me that you will give me only a yes or

3    no answer?

4         **THE COURT:**  He doesn't have to give you a yes or no

5    answer.  He is entitled to explain his answer.  Ask your

6    question.

7    Q    You never saw Jorge Garza in the patrol unit that

8    conducted the traffic stop; isn't that correct?

9    A    It's just that he would be driving the patrol car.

10        **THE COURT:**  Why don't we take our recess.  We've

11   asked this question 20 or 30 times.

12        This will be our mid-afternoon recess.  It will be

13   our only recess.  I do have some cases to hear unrelated to

14   this during this time, so this will be maybe a 20 minute recess

15   or so.  I don't -- it's hard to predict how long these other

16   cases take.

17        **(Jurors exit courtroom at 2:56 p.m.)**

18        **(Portion omitted from 2:56 to 2:59 p.m.)**

19        **(Recess taken from 2:59 p.m. to 3:31 p.m.)**

20        **(Jurors enter courtroom at 3:31 p.m.)**

21        **THE COURT:**  All right.  Good afternoon.  Please be

22   seated.  All right.  Do you want to pick up where we left off

23   or maybe move on?  Either way you're -- you may proceed.

24   //

25   //

1                **CROSS EXAMINATION (CONTINUED)**

2  BY MS. GUTIERREZ:

3  Q    Mr. Guerra, can you -- do you need glasses to see or do

4  you have good vision?

5  A    I have good vision.

6  Q    Can you see me okay?

7  A    Sure, I do.

8  Q    I'm wearing glasses, aren't I?

9  A    (Speaks Spanish)

10        **MS. GUTIERREZ:**  Your Honor --

11        **THE COURT:**  All right.  That's a -- that's plenty.

12  Q    Mr. Guerra, my dress is yellow?

13        **THE COURT:**  Hang on.  We've got to translate.

14        **MS. GUTIERREZ:**  I'm sorry, you're right.

15  A   Well, you're wearing glasses kind of brownish in color.

16  You're wearing earrings.  You also have a chain.  You're

17  holding a pen on your hand and you also have a bracelet with

18  little beads on the right hand.

19  Q    Mr. Guerra, my dress is yellow, correct?

20  A    (No audible response)

21        **THE COURT:**  All right, let's move on.

22        **MS. GUTIERREZ:**  Your Honor, I just want to show that

23  Mr. Guerra can answer yes or no questions.

24        **THE COURT:**  He can answer --

25        **THE WITNESS:**  It's yellow and it has round circles,

1    dots.

2            THE COURT:  He's -- the record will -- and so --

3    there we go.  He didn't answer yes or no.

4            THE WITNESS:  (Speaks in Spanish)

5            THE COURT:  That's okay, Mr. Guerra.

6            THE WITNESS:  Also wearing a headpiece.

7    Q    Mr. Guerra, you testified that your shop is being taken

8    from you but your trucking company business is not; is that

9    correct?

10   A    Correct, the shop has been seized.

11   Q    What is the address to your shop?

12   A    It's 2812.  I don't know what's the lot number.  My wife

13   knows that.  I believe it's Lot Number 19.  It's a corner lot

14   where the shop is.

15   Q    What is the name of the street?

16   A    8408 Sunrise Strip.

17   Q    And that's the address to the shop that the government's

18   taken from you; is that correct?

19   A    No, not the store.  It's the shop.

20   Q    So the Sunrise address you just gave me is the address to

21   the shop that the government is taking from you, yes?

22   A    No, you're asking about the store but that's different

23   from the shop.  The address to the shop is 2812, so it's next

24   to the store, but it's independent from the shop.

25   Q    So what is the address to your shop?

1   A    The first shop, this is next to the store.  My wife knows

2   the address.  I don't know.  You want to ask my lawyer?

3   Q    Mr. Guerra, do you have an office which is located on

4   Rancho Alto Drive in Edinburg, Texas?

5   A    Correct.

6   Q    And what office is that?

7   A    That's an office.  We're leasing it from my sister.  We're

8   paying her rent.

9   Q    Isn't it true that after you sent the Panama Unit to

10  conduct an operation in Mercedes, Texas they brought back some

11  drugs to that address?

12  A    No.

13  Q    Isn't that the time that they brought you cocaine and you

14  believed it was heroin?

15  A    To what address?

16  Q    It's an office located on Rancho Alto Drive in Edinburg,

17  Texas.

18  A    I believe, yes, yes.  They did go there.

19  Q    And sometimes the Panama Unit would take drugs to your

20  son, Fernando Guerra, Jr.'s ranch; isn't that correct?

21  A    I would not be able to answer that question with a yes or

22  no because my son never dealt directly with them.

23  Q    Well, right, Mr. Guerra, but you had access to your son's

24  ranch, didn't you?

25  A    Yes.

1    Q    And so my question is isn't it true that the Panama Unit

2    sometimes, on occasion, took the drugs back to your son's

3    ranch?

4    A    I don't recall exactly.

5    Q    At times, you also had the Panama Unit conduct traffic

6    stops on vehicles that contained drugs, correct?

7    A    They never -- they would do their work independently from

8    us.

9    Q    Well, but my question is that on some of the trips that

10   you gave the Panama Unit those had to do with vehicles that

11   contained narcotics not just homes, correct?

12   A    Yes, on one occasion, yes.

13   Q    And so the Panama Unit also conducted traffic stops for

14   you; isn't that correct?

15   A    Yes.

16   Q    Mr. Guerra, isn't it true that you're testifying today in

17   order to get a reduction on your sentence?

18   A    That question you may ask to my lawyer.

19   Q    Well, I'm asking you.  Isn't it true that you are

20   testifying and in exchange for your testimony today you are

21   going to get a reduction on your sentence?

22   A    My attorney told me that.

23   Q    And that's why you agreed to do it, correct?

24   A    Correct.

25   Q    And that percentage is anywhere -- the reduction of your

1   sentence is somewhere around -- a third of your sentence will

2   be reduced if you testify; isn't that right?

3   A    I don't know exactly what the amount is.  Your Honor knows

4   that but you can ask that question to my lawyer, with all due

5   respect.

6   Q    But it is your expectation that you -- that your sentence

7   be reduced in exchange for your testimony today, correct?

8   A    With all due respect, let me repeat that.  That question

9   could be answered by my lawyer; he's present here.

10           **MS. GUTIERREZ:**  Your Honor, may I approach the

11   witness?

12           **THE COURT:**  You may.  What's the exhibit number on

13   this one?

14           **MS. GUTIERREZ:**  Exhibits 6 and 7, your Honor.

15           **THE COURT:**  All right.

16           **MR. STURGIS:**  No objection, your Honor.

17           **THE COURT:**  You want to just show them from the ELMO

18   then?  Six and seven the Court will admit.

19       **(Defense Exhibits Numbers 6 and 7 were received in**

20   **evidence)**

21   **BY MS. GUTIERREZ:**

22   Q    Mr. Guerra, do you recognize that signature?

23           **MS. GUTIERREZ:**  Are they admitted, your Honor?

24           **THE COURT:**  We admitted it.  The government has no

25   objection.  Everybody has previously seen the document.

1          **THE WITNESS:**  What about the signature?

2          **MS. GUTIERREZ:**  I'll ask you in a little bit.  Hold

3     on, okay?

4     **BY MS. GUTIERREZ:**

5     Q     Mr. Guerra, do you recognize this document?

6     A     Sure, I do.

7     Q     And is that your signature?

8     A     Correct.

9     Q     And can you tell the jury what this document represents?

10    A     That's the address at 1002 Sunrise Street in Edinburg and

11    that's also the other place on FM 1017 and then there's a

12    little ranch I also own.

13    Q     Mr. Guerra, this document represents the plea agreement

14    that you entered into with the government; isn't that correct?

15         **MR. STURGIS:**  Objection.  May I (indiscernible).

16    A     Correct.

17    Q     Mr. Guerra, do you recall having reviewed this document

18    and then signing it?

19    A     Sure, I do, yes.

20    Q     And you did that when you entered your guilty plea on this

21    case; is that correct?

22    A     Correct.

23    Q     And the agreement that you and the government entered into

24    is that you would enter a guilty plea to Count One of the

25    Indictment; is that correct?

1  A    Yes.

2  Q    And Count One of the Indictment charges you with a

3  conspiracy to possess with intent to distribute marijuana,

4  cocaine, and methamphetamine, correct?

5  A    Correct.

6  Q    And you entered a guilty plea as to Count One, the way

7  that it was written; is that correct?

8  A    Correct.

9  Q    And part of the agreement was that you agreed to forfeit

10  the properties listed in this document, correct?

11  A    Yes, those are five properties.

12  Q    Is that yes, Mr. Guerra?

13  A    Yes, correct.

14  Q    So in exchange for your guilty plea of -- to Count One of

15  the Indictment, the government is going to reduce your levels

16  by two; is that correct?

17  A    I believe.  Can I ask that to my lawyer or can I?

18  Q    If you don't know the answer to the question you can just

19  say you don't know the answer to the question.

20  A    With all due respect, I would like my attorney to answer

21  that question for you.

22  Q    Well, are you able to answer the question?

23         **MR. STURGIS:**  Your Honor, maybe if this will help,

24  the government would stipulate that the government will

25  recommend two points down lower on the guideline range if he

1    accepts responsibility and proceeds forward.  The government

2    will stipulate to that.

3              **MS. GUTIERREZ:**  Very well, your Honor.

4              **THE COURT:**  All right.

5    Q    Mr. Guerra, your understanding of this plea agreement is

6    that all the other counts in the Indictment are going to be

7    dismissed at the time of sentencing, correct?

8    A    Correct.

9    Q    And isn't it true that your son, Fernando Guerra, Jr.,

10   also entered into the same plea agreement with the government?

11   A    With all due respect, he's the only person that can answer

12   that question.

13   Q    But you are aware that your son, Fernando Guerra, Jr.,

14   pled guilty to some charges, correct?

15   A    I cannot speak to my son so there's that restriction so I

16   cannot answer that question.

17   Q    But isn't it true when you entered your guilty plea your

18   son was standing right next to you entering his guilty plea?

19   A    Yes, he pled guilty.

20   Q    Mr. Guerra, you don't read the English language?

21   A    No.

22   Q    And you don't speak the English language?

23   A    No.

24   Q    And you don't understand the English language?

25   A    No.

1          **MS. GUTIERREZ:**  I pass the witness.

2          **THE COURT:**  All right.  Redirect?

3          **MR. STURGIS:**  Very short, your Honor.

4                    **REDIRECT EXAMINATION**

5    **BY MR. STURGIS:**

6    Q    Mr. Guerra, going back a little ways, your initial

7    involvement with the defendant, Mr. Garza, started with the

8    traffic stops really for identification information purposes;

9    is that correct?

10   A    Yes, sir.

11   Q    During those stops did you actually see, witness and see

12   him yourself, conducting those stops?

13   A    Sure, of course I did.  It was during the daylight.

14   Q    You saw the person?

15   A    Correct.

16   Q    Do you see the person that was conducting those stops for

17   you in this courtroom?

18   A    Yes.

19   Q    And where is that person?

20   A    He's here.

21   Q    Okay.  And was that person wearing a uniform when he was

22   conducting those stops?

23   A    Correct and he had his weapon on his left side.

24   Q    He was wearing a weapon on the left side?

25   A    Yes, yes, Mr. Prosecutor.

1  Q    And then later it evolved into Mr. Garza assisting you by

2  conducting those fake traffic stops so that you could keep the

3  narcotics and resale them?

4         MS. GUTIERREZ:  Your Honor, objection.  Objection,

5  leading.

6         THE COURT:  Sustained.

7  Q    Did it -- did the traffic stops later turn into the drug

8  stops?

9  A    Correct.

10 Q    And did those help you and your son in your narcotics

11 activities?

12 A    Yes, sir.

13 Q    I believe you testified earlier that the vehicle that was

14 assisting you was a white Expedition; is that correct?

15 A    Yes.  It had clear windows.  It did not have dark tint.

16 Q    And these traffic stops or fake traffic stops occurred

17 after five o'clock; is that correct?

18 A    Around like 6:30 which was not completely dark.

19 Q    But getting dark?

20        MS. GUTIERREZ:  Objection, your Honor, leading.

21        THE WITNESS:  Excuse me?

22        MR. STURGIS:  I was just trying to clarify because he

23 said not quite.

24        THE COURT:  Please stand if you're going to address

25 the Court.

1           **MR. STURGIS:**  Oh, I apologize, your Honor.

2           **THE COURT:**  What is it you would like to say?

3           **MR. STURGIS:**  My understanding was that he was

4  explaining that it wasn't totally dark.  I thought that's what

5  he --

6           **THE COURT:**  You can clarify.

7           **THE WITNESS:**  Correct.

8  Q    Was it starting to get evening time?

9  A    Yes, but it would always be around 6:30 and on but you can

10 still see people inside cars.  Once at 7:30 or later, you

11 can't, not as much.

12 Q    And you testified that Mr. Flores was talking to Mr. Garza

13 during these events?

14 A    Correct.

15 Q    And they were using a phone?

16 A    Yes.

17 Q    Can you describe the phone that they were using, the type

18 of phone that they were using?

19 A    Mr. Flores would use a phone with a little apple but that

20 was his personal phone.  He would never want to use a radio,

21 only one occasion we gave Mr. Garza a radio but he didn't like

22 using the radio.

23 Q    When these conversations were taking place could you hear

24 both sides of the conversation?

25 A    Of course, yes.

1  Q    Okay.  And did you know Mr. Garza's voice?

2  A    Yes because on other two occasions I also greeted him at

3  the -- at the bank, at Wells Fargo.

4  Q    And during these events you heard his voice?

5  A    Yes.

6  Q    Aside from hearing the voice and whatever Mr. Flores may

7  have told you did you actually see the person that was driving

8  that Expedition during these events?

9  A    Of course, yes.

10 Q    And who did you see driving the white Expedition?

11 A    The man, Mr. Garza.

12        **MR. STURGIS:**  Pass the witness, your Honor.

13        **THE COURT:**  All right.  Any final --

14        **MS. GUTIERREZ:**  Yes, your Honor.

15        **THE COURT:**  Limited to redirect.

16                    **RECROSS EXAMINATION**

17 BY MS. GUTIERREZ:

18 Q    Mr. Guerra, if two weeks from today you overheard someone

19 on a telephone speaking to another female, you wouldn't be able

20 to tell whether that female voice was mine, would you?

21 A    Believe me.  I've been very cautious in everything I do

22 and the voices I hear I never forget.

23        **MS. GUTIERREZ:**  Objection, well, your Honor, due to

24 the interpretation -- he says "The voices I hear regularly."

25        **THE COURT:**  All right.  It's a fair correction of the

1  record.

2  Q    Now at 6:30 it's light out; isn't that right?

3  A    Sure.

4  Q    It's not dark?

5  A    No, it's not dark depending on the weather but at 6:30

6  it's almost impossible for it to be dark.

7  Q    And isn't it true that while you were driving along in

8  preparation for the fake traffic stops you didn't want to be

9  seen; isn't that correct?

10      MR. STURGIS:  Counsel, if you could repeat the last

11  part.

12  Q    You didn't want to be seen; isn't that correct?

13  A    (Speaks Spanish)

14      MS. GUTIERREZ:  Objection, your Honor, nonresponsive.

15      THE COURT:  All right.  Please interpret what he said

16  thus far.

17      THE WITNESS:  I never drove.  It was Mr. Flores

18  driving and the owners of the merchandise didn't know me.

19      THE COURT:  All right.  Try and listen to her

20  question more carefully.  Please repeat or restate your

21  question.

22  BY MS. GUTIERREZ:

23  Q    Isn't it true that when you were engaged in these fake

24  traffic stops you didn't want to be seen?

25  A    To be seen by who?

1   Q    By anyone?

2   A    I was riding with Mr. Flores in his truck.  I would

3   coordinate things with Mr. Flores who would in turn would be

4   speaking with Amigo.

5   Q    But you weren't in the same vehicle with the owner, right,

6   and you made a choice to not to be in the same vehicle with the

7   owner?

8   A    I was never with the owner of the material; that job was

9   being done my son.  I was with Mr. Flores so I never got to

10  know the owners.

11  Q    And you didn't want to get to know the owners; isn't that

12  correct?

13  A    The owners would be riding with my son.  He was with them

14  and I was with Flores who was communicating with Mr. Garza;

15  that's the way it was.  Me and there was also an extra car that

16  was briefing us when the car was leaving and where it was

17  going.  Once it was on the Cristo we were being made aware but

18  I never met the owners and the owners never met me.

19  Q    But Mr. Guerra, you and JP Flores were directing the scam;

20  isn't that true?

21  A    Correct.  I would be getting calls.  I would be riding

22  with Flores.  Flores would be communicating with Amigo and

23  everything was coordinated.

24  Q    And you were scamming the owner of the drugs which was

25  riding with your son in a different vehicle, right?

1    A     (Speaks Spanish)

2              **MS. GUTIERREZ:**  Objection, nonresponsive, your Honor.

3              **THE COURT:**  All right.  Please translate what he said

4    so far.

5              **THE WITNESS:**  Those would be -- the jobs would be --

6    that would be brought to us and so we had to do these fake

7    scenarios.

8              **THE COURT:**  All right.  This is also going beyond I

9    think the redirect.

10             **MS. GUTIERREZ:**  Your Honor --

11             **THE COURT:**  It's just limited to identity.

12             **MS. GUTIERREZ:**  Well, your Honor, he testified that

13   this happened during the day.  This happened -- well, not

14   during the day but when it was still light out; that he was

15   clearly visible when in fact -- I'm not too concerned about

16   continuing my argument because it's being interpreted to the

17   witness and might give him some insight as to where this is

18   going so he can change his testimony, if we can approach.

19             **THE COURT:**  You may.

20        **(Begin bench conference at 3:58 p.m.)**

21             **THE COURT:**  I don't know if they translate --

22             **MS. GUTIERREZ:**  They are translating.  He is

23   translating.

24             **THE COURT:**  Okay.

25             **MS. GUTIERREZ:**  He's saying that it was clearly

1   visible; that he saw Garza.  He had pulled this scheme,

2   involved him being concealed.  So that's my point here is how

3   can you say that it was out in the open and you could see when

4   he was trying to conceal himself?  So he wouldn't

5   necessarily --

6               THE COURT:  Why was he trying to conceal himself?

7               MR. STURGIS:  That's not what he testified to.

8               MS. GUTIERREZ:  Because he was committing a scam.

9   The owner, he couldn't --

10               MR. STURGIS:  But he testified he didn't care if he

11   had been seen because the owners didn't know him.  He didn't

12   care if they saw him.  They wouldn't know who he was.

13               MS. GUTIERREZ:  He didn't say that the owners didn't

14   know him.

15               MR. STURGIS:  That's what he said.  That's what he

16   testified to.

17               MS. GUTIERREZ:  He said he didn't meet the owners.

18               MR. STURGIS:  And they didn't know him.

19               MS. GUTIERREZ:  But I just feel that this type of

20   scam, it's going to be done in the cover of night and so that's

21   why --

22               THE COURT:  But we know sometimes it wasn't but

23   sometimes -- didn't the son say --

24               MS. GUTIERREZ:  Yes.

25               THE COURT:  -- it was after dark on occasion?

1          MR. STURGIS:  They said --

2          MS. GUTIERREZ:  Yes.  He said it was dark.

3          MR. STURGIS:  -- the one that was on the 19th, they

4   said was after one of the first ones.

5          THE COURT:  Yes, yes, the one with Rene Garcia's

6   load.

7          MR. STURGIS:  Right, Rene Garcia's load.

8          MS. GUTIERREZ:  No, he basically said I think all of

9   them were done at night.

10          MR. STURGIS:  Well, I don't remember him saying that.

11          THE COURT:  Well, he was -- the son was only -- I

12   thought the son was only --

13          MR. STURGIS:  He was involved in a bunch of them but

14   the Garcia one was different because it wasn't their idea.

15          THE COURT:  Okay.  Well, he's also tired.  He's been

16   testifying a while.

17          MS. GUTIERREZ:  You think that I have compassion for

18   this man?

19          THE COURT:  No, I mean you can --

20          MR. STURGIS:  But I'm fair.

21          THE COURT:  Maybe some of his -- they're not --

22          MS. GUTIERREZ:  I mean some of his (indiscernible)

23   just answer the question.

24          MR. STURGIS:  But you can just ask him that, "Did you

25   see the owners?  Did you care if the owners saw you?"  You can

1   just ask him those direct questions.

2           THE COURT:  And simplify it.

3           MS. GUTIERREZ:  Yes, I know.

4           MR. STURGIS:  Well, if you don't like the answer.

5           THE COURT:  All right, let's try it again.

6       (End bench conference at 4:00 p.m.)

7           THE COURT:  All right.  You may proceed.

8   BY MS. GUTIERREZ:

9   Q    Mr. Guerra, it was not in your best interests to be seen

10  out there in the vicinity of these scams; isn't that correct?

11  A    Well, this was happening on the street, Monte Cristo, a

12  street where normally there's a lot of vehicles on it.

13  Q    Well, it was my understanding that the reason that these

14  areas were chosen, the Jesus Flores and the Monte Cristo

15  intersection area was chosen because there wasn't a lot of

16  population and it was less likely that people would be seen.

17  A    Well, what really was happening is that Mr. Flores chose

18  (indiscernible) Canyon and 88 because there were no patrol cars

19  around there but more importantly so that Mr. Garza would not

20  be seen because he was not supposed to be able to make traffic

21  stops.

22  Q    And so then it was in the -- it was beneficial for these

23  traffic stops to be done not in -- when it's broad daylight but

24  as it's getting dark, correct?

25  A    Correct, but it was not getting dark.  It was after 6:30

1    and on so that place was chosen by Mr. Flores, those streets

2    because way back then he had been trained on those streets by

3    Mr. Garza.  Mr. Garza had trained him over 30 years ago -- 28

4    years ago it was that Mr. Flores had been trained.

5    Q    Sometimes the big traffic stops were done at 8:00, 7:00

6    o'clock; isn't that correct?

7    A    Well, depending on the hour, it would be from 6:30 on but

8    not too late either because it would be something very quick.

9    Q    So then your testimony to the jury is that it was -- the

10   big traffic stops were never conducted before 6:30; is that

11   correct?

12   A    No, it would not be after 6:30 regularly because it can't

13   be too late because then you could spot the lights and should

14   another patrol car see those lights, you know.  We also had

15   companero, people, placed to see if it didn't come back; that

16   was a very important thing to preserve.

17             **MS. GUTIERREZ:**  May I approach, your Honor, the --

18             **THE COURT:**  The exhibit, you may, or the projector.

19             What are you looking for?

20             **MS. GUTIERREZ:**  He hasn't seen these pictures, right,

21   to go through them?

22   Q    Mr. Guerra, I'm going to show you what has been marked

23   Government's Exhibit Number 3.

24             Do you recognize that road as being Jesus Flores

25   Road?

```
 1   A    (No audible response)

 2   Q    I'm sorry.  Let me ask you this.  Do you recognize this

 3   road as being Monte Cristo and Jesus Flores Road?

 4   A    This way I cannot really say.  I'm looking at it but you

 5   don't have to display the documents like that.  I can see from

 6   here, the document you have in your hand.

 7   Q    Very well.  I'm putting them up for the purpose, for the

 8   jury, so I am going to be putting them up and asking you

 9   questions.  Okay?

10   A    Yes.

11   Q    My question is do you recognize this as Monte Cristo and

12   Jesus Flores Road?

13   A    (No audible response)

14        MS. GUTIERREZ:  Your Honor, I'd like the record to

15   reflect that the witness oftentimes looks at Mr. Sturgis when

16   he doesn't answer -- he doesn't know how to answer a question.

17        THE COURT:  The jury can see what he -- who he's

18   looking at or where he's not looking.  I haven't seen any

19   signaling or anything from anyone.

20        THE WITNESS:  (Speaks Spanish)

21        MS. GUTIERREZ:  Your Honor, nonresponsive.  This is

22   -- was not a question for him.

23        THE COURT:  All right, but it was -- he felt the need

24   to respond.  It needs to be translated.

25        THE WITNESS:  With all due respect, I'm looking at
```

1   the jury and elsewhere.

2          THE COURT:  All right.  May I ask a question of the

3   jury?

4          Is there anyone here who is -- who does not

5   understand Spanish?

6       (No audible response)

7          THE COURT:  All right.  I kind of think all of us do.

8   All right.  You may proceed.

9   BY MS. GUTIERREZ:

10  Q   Mr. Guerra, in this picture do you recognize these roads

11  as Monte Cristo Road and Jesus Flores Road?

12  A   With the screen here let me repeat.  I cannot tell.  I

13  mean if I were to tell you -- I really cannot tell.  I see

14  clearly but it's impossible for me to tell you if it is that

15  street.

16  Q   Okay.  I'm going to show you Government's Exhibit 7.  I'm

17  going to ask you to take a look at that and tell me if you

18  recognize that as Jesus Flores Road.

19  A   That's it, that's the one.

20  Q   And again, Government's Exhibit 6, and I want you to tell

21  me if you recognize this as Jesus Flores Road.

22  A   That's the one right after the hill, the caliche ends.

23  Q   And Mr. Guerra, isn't this the reason why you chose Jesus

24  -- you-all chose Jesus Flores Road because once you pass this

25  hill you can no longer see from Monte Cristo what is going on

1   on Jesus Flores Road?

2   A    Basically it's a lonely street and it was used only

3   because -- there was no need to reach the hill because people

4   could see that a car had been stopped.  That's the owner.  You

5   didn't have to go over the hill and the owner would be -- the

6   owner would be riding on Monte Cristo and would see these.

7   Q    So is it your testimony to the jury that all the traffic

8   stops, the fake traffic stops that were conducted on Jesus

9   Flores Road were conducted before you got to this hill?

10  A    On one occasion it was not after, past the hill.

11  Q    And so tell me in total how many fake stops were conducted

12  on Jesus Flores Road.

13          **THE COURT:**  Ms. Gutierrez, we are way afield of the

14  redirect.  Your cross is limited to what was brought on

15  redirect which were identity issues.  So please move on --

16          **MS. GUTIERREZ:**  Very well, your Honor.

17          **THE COURT:**  -- or we're done.

18  Q    Mr. Guerra, you testified a little bit ago about having

19  identified Mr. Garza in some traffic stops for the purpose of

20  making identifications.

21          Do you recall that?

22  A    (Speaks Spanish)

23          **MS. GUTIERREZ:**  Objection, nonresponsive.

24          **THE COURT:**  It needs to be translated.

25          **THE WITNESS:**  I would see him.  We would start at

1    6:30 and you could see people.  The windows to his patrol car

2    were clear.

3           **THE COURT:**  All right.  Overruled.  Next question?

4    **BY MS. GUTIERREZ:**

5    Q    Mr. Guerra, Attorney Sturgis asked you about how Mr. Garza

6    initially would stop vehicles to identify the people before any

7    of the fake traffic stops began.

8           Do you recall that?

9    A    Yes.

10   Q    And so we're talking about two different types of stops;

11   is that right?

12   A    Correctly, and what you're asking right now is about the

13   stops and it's two types of that and you already a while ago

14   asked me about that.

15   Q    My question is going to focus on the first type of stop

16   where you're stating that Mr. Garza would stop individuals to

17   get their identification.

18   A    Correct; that would be during the day.

19   Q    And those were done prior to 6:30?  Those were done in

20   broad daylight, correct?

21   A    No, those would be done during the day at 1:00 or 2:00

22   p.m., at any time.

23   Q    And Mr. Guerra, you were not the person that would call

24   Mr. Garza and ask him to stop those vehicles?

25   A    I am Mr. Guerra.

1  Q     Sorry, Mr. Guerra.  Mr. Guerra, you were not the person

2  who would call Mr. Garza and tell him what vehicle to stop?

3  A     I never spoke with the man.  I would call companero; that

4  is JP, who in turn would call him and it would -- he would call

5  in the things.  He would tell him what type of car it was and

6  how it would be done so it would be done in daylight, check the

7  license.

8  Q     And during those stops there were neither real drugs nor

9  fake drugs involved, correct?

10 A     No, and it would be done during the day and the excuse

11 that Mr. Flores would use is that they had crossed over the

12 line and so he would stop them, get their ID, and that was it.

13 There were never any arrests.

14 Q     You testified that you would call Flores who in turn would

15 call Garza, correct?

16 A     Correct.

17 Q     So you were not present and you were not -- you were there

18 to hear what Flores instructed Garza to do, correct?

19 A     On occasions, certain occasions, I was with him and on

20 other ones I was not but we would see Mr. Garza stop people to

21 get their real ID.

22 Q     And how is it that you were able to view the stop?

23 A     Because the stops would be done at different locations

24 like 2812 or on Doolittle, different places where you could

25 just drive by and observe things.

1   Q    And so would you be following the vehicle and ask for that

2   vehicle to be stopped?

3   A    No, no.  I had talked to them earlier before they left.

4   Once they left I had already told them where to go and then I

5   would tell Mr. Flores they're going to be there in five

6   minutes.  He then before that had already called Garza.

7   Q    So these were individuals that you had some sort of

8   contact with already?

9   A    Of course, yes.  I would talk to these people, tell them I

10  will meet you somewhere at 1:00 p.m. and right away I would

11  radio Mr. Flores, who would in turn call Mr. Garza.

12  Q    So would the traffic stops be conducted while -- at the

13  time you were planning to meet with these individuals?

14  A    When they left my place where we had met that's when --

15  after they had left the meeting I would call Mr. Garza who

16  would then call in the things and Flores would call Garza after

17  I had met with them and Flores would tell him which car it was.

18  Q    And these were individuals that you were discussing drug

19  deals with, correct?

20  A    Sure.

21         THE COURT:  This is redundant.  Let's --

22         MS. GUTIERREZ:  Well, your Honor --

23         THE COURT:  -- move on.

24         MS. GUTIERREZ:  He hasn't established how he's seen

25  them.  Let me ask one more question.

1          **THE COURT:**  Well, let's get to the point then.

2  **BY MS. GUTIERREZ:**

3  Q    Mr. Guerra, would you walk out to the street to witness

4  the stop?

5  A    With all due respect, I'm going to tell you this.  For

6  those stops, I would already be riding a different car and just

7  drive by because these were places that we had selected, places

8  that can be seen from any street.  So if I were to be -- I was

9  in a different car.

10  Q    You testified that you or you say "We gave" Mr. Garza a

11  radio but in fact you never gave Mr. Garza anything to sell,

12  correct?

13  A    I never gave it to him personally.  They sent it to him

14  through Mr. Flores who gave it to him.  He used it on one

15  occasion.  The man did not like talking over the radio so after

16  that we just used the phone and he sent the radio back to me.

17  Q    Mr. Guerra, other than testifying there was no other way

18  that you could get a reduction on your sentence available to

19  you; isn't that correct?

20          **MR. STURGIS:**  I'm going to object again.  This is

21  outside the scope of direct.

22          **THE COURT:**  Sustained.

23          **MS. GUTIERREZ:**  Well, your Honor, I was able to

24  address it just a minute ago.

25          **THE COURT:**  Because there was no objection I perhaps

127

1    -- these are identity questions you can ask.

2            **MS. GUTIERREZ:**  I pass the witness.

3            **THE COURT:**  All right.  Mr. Guerra, that concludes

4    your testimony.  Thank you for being here and you're excused at

5    this time.

6            **THE WITNESS:**  Thank you.

7        **(Witness excused)**

8        **(Requested transcription concluded at 4:20 p.m.;**

9    **proceeding continued)**

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____          May 13, 2014_

TONI HUDSON, TRANSCRIBER